KUSKIN, J.T.C.
TABLE OF CONTENTS
I. Introduction........................................7
II. Years and Assessments In Issue......................7
III. Issues.............................................8
IV. General Factual Background ........................11
V. Applicable Legal Principles..........................12
VI. Discussion and Analysis of Issues....................14
A Imputation of Interest...........................14
(1) Cash Management System (GS, Telecom, UPSCO, AF and WWF).........14
(2) Warehoused Liabilities (GS)...................24
(3) Deduction of Imputed Interest (UPSCO)........32
B. Allocation of Revenue to New Jersey-DPU Revenue (GS).................................34
C. Allocation of Revenue to New Jersey (Telecom).....39
*7 D. Allocation of Revenue to New Jersey (UPSCO, AF, and WWF)...............................41
E. Penalties (GS, Telecom, AF, and WWF)............47
(1) Late Payment Penalties......................48
(2) Amnesty Penalties...........................51
VII. Summary.........................................55
I.
Introduction
Plaintiffs in these matters challenge assessments of Corporation Business Tax (“CBT”) imposed by defendant, Director of the New Jersey Division of Taxation (“Director”), pursuant to the New Jersey Corporation Business Tax Act, N.J.S.A. 54:10A-1 to -41, and related regulations promulgated by the Director. Each plaintiff is a member of the United Parcel Service group of companies (“UPS Group”), consisting of United Parcel Service of America, Inc. (“America”) as the parent corporation and, during the years in issue, over one hundred subsidiary corporations including plaintiffs. The matters were consolidated for trial. The findings and conclusions in this opinion are based on the testimony and documentary evidence presented at trial, my evaluations of the credibility of the witnesses, and the pre-trial and post-trial briefs and reply briefs submitted by the parties as well as their respective proposed findings of fact.
II.
Years and Assessments In Issue
The years in issue in these appeals vary from plaintiff to plaintiff. The following are the years in dispute as to each plaintiff and the aggregate amount of the assessments being challenged by each:
1. As to United Parcel Service General Services Co. (“GS”), the period in dispute is January 1, 1991 through December 31,1995, and the aggregate assessments *8 being challenged, including interest through November 15, 2004 and penalties, total $19,017,099.64;
2. As to UPS Telecommunications, Inc. (“Telecom”), the period in dispute is January 1, 1996 through December 31, 1999, and the aggregate assessments being challenged, including interest through October 15, 2004 and penalties, total $249,166.85;
3. As to United Parcel Service Co. (“UPSCO”), the period in dispute is January 1, 1991 through December 31, 1995. No additional assessments were imposed on this entity. UPSCO challenges the Director’s calculation of the deductible portion of interest that the Director imputed with respect to loans from America to UPSCO;
4. As to UPS Worldwide Forwarding, Inc. as successor in interest to UPS Air Forwarding, Inc. (“AF”), the period in dispute is January 1,1991 through June 30, 1992, and the aggregate assessments being challenged, including interest through November 15, 2004 and penalties, total $4,267,070.15;
5. As to UPS Worldwide Forwarding, Inc. (“WWF”), the period in dispute is January 1, 1993 through December 31, 1995, and the aggregate assessments being challenged, including interest through November 15, 2004 and penalties, total $2,066,155.76.
III.
Issues
The issues presented in these appeals comprise three general categories: 1) whether the Director properly imputed interest with respect to certain transactions (i) between each plaintiff and America and (ii) between GS and other members of the UPS Group including the other plaintiffs; 2) whether the Director properly allocated to New Jersey certain receipts of each plaintiff; and 3) whether the Director properly imposed on each plaintiff late payment and amnesty penalties.
The imputation of interest issues involve application and interpretation of N.J.S.A. 54:10A-10 which authorizes the Director to make adjustments in order to correct distortions in a corporation’s reporting, in its CBT returns, of its entire net income and authorizes the Director to include in entire net income a corporation’s “fair profits” resulting from transactions with related corporations. In pertinent part, this statute provides as follows:
a. Whenever it shall appear to the director that any taxpayer ... conducts its business or maintains its records in such manner as either directly or indirectly to distort its true entire net income or its trae entire net worth under this act or the proportion thereof properly allocable to this State, or whenever any taxpayer maintains a place of business outside this State, or whenever any agreement, understanding or arrangement exists between a taxpayer and any other corpora *9 tion or any person or firm ... whereby the activity, business, receipts, expenses, assets, liabilities, income or net worth of the taxpayer are improperly or inaccurately reflected, the director is authorized and empowered, in the director’s discretion and in such manner as the director may determine, to adjust and redetermine such items, and to adjust items of gross receipts ... within and without the State and the allocation of entire net income ... or to make any other adjustments in any tax report or tax returns as may be necessary to make a fair and reasonable determination of the amount of tax payable under this act.
b. Where (1) any taxpayer conducts its activity or business under any agreement, arrangement or understanding in such manner as either directly or indirectly to benefit its members or stockholders, or any of them, or any person or persons directly or indirectly interested in such activity or business, by entering into any transaction at more or less than a fair price which, but for such agreement, arrangement or understanding, might have been paid or received therefore, or (2) any taxpayer, a substantial portion of whose capital stock is owned either directly or indirectly by or through another corporation, enters into any transaction with such other corporation on such terms as to create an improper loss or net income, the director may include in the entire net income of the taxpayer the fair profits which, but for such agreement, arrangement or understanding, the taxpayer might have derived from such transaction. The director may require any person or corporation to submit such information under oath or affirmation, or to permit such examination of its books, papers and documents, as may be necessary to enable the director to determine the existence, nature or extent of an agreement, understanding or arrangement to which this section relates, whether or not such person or corporation is subject to the tax imposed by this act.
¡N.J.S.A. 54:10A-10.1
The issues also involve interpretation of N.J.A.C. 18:7-5.10, a regulation promulgated by the Director for purposes of implementing the provisions of N.J.S.A. 54:10A-10. Subparagraphs (a)(1) and (2) of the regulation essentially reiterate the quoted statutory provisions. Subparagraph (a)5 provides in pertinent part as follows:
Under N.J.S.A. 54:10A-10(b) interest should be charged on loans or advances made by one related party to another from the day after the debt arises until the debt is satisfied. With respect to intercompany trade receivables of related taxpayers, interest is not required to be charged on an intercompany trade receivable before the first day of the third calendar month.
[N.J.A.C. 18:7-5.10(a)5.]
The allocation of receipts issues involve application and interpretation of N.J.S.A. 54:10A-6, which sets forth the methodology for allocating or apportioning income to New Jersey by a taxpayer that maintains “a regular place of business” outside of this State.[1] *10 Under this statute, the allocation process involves calculation of a property fraction, a sales fraction (generally referred to as the receipts fraction), and a payroll fraction. The numerator of each fraction is the property, receipts, or payroll of the corporation attributable to New Jersey, and the denominator of each fraction is the property, receipts, or payroll, respectively, of the corporation everywhere. As to plaintiffs UPSCO, AF and WWF, the allocation of receipts issue also requires interpretation of N.J.A.C. 18:7-8.10(c)4i; which contains a special allocation formula for airlines.
The late penalties issue involves interpretation of N.J.S.A. 54:49-6a, which permits the Director to impose a late payment penalty, N.J.S.A. 54:49-11a, which permits the Director to waive the penalty under certain circumstances, and N.J.A.C. 18:2-2.7(b), a regulation implementing the provisions of N.J.S.A. 54:49-11a. The amnesty penalty issue involves a determination as to whether the penalties imposed under N.J.S.A. 54:53-17b and -18b were intended to be applicable to the factual circumstances presented in these appeals.
The foregoing general categories of issues include a variety of sub-issues, some of which are applicable to more than one plaintiff and some of which relate only to one plaintiff. The following is a summary of the sub-issues:
1. Should interest be imputed to each plaintiff other than UPSCO in connection with transfers of cash to America pursuant to the UPS Group cash management system;
2. Should interest be imputed to GS in connection with certain liabilities shown on its balance sheet and reported on its CBT returns as loans to America;
3. Should interest be imputed with respect to amounts shown on UPSCO’s CBT returns as loans from America, and, if so, has the Director correctly calculated the deduction available to UPSCO with respect to the imputed interest;
4. Should all or any portion of receipts related to services performed by the GS data processing unit (“DPU”) for other members of the UPS Group be allocated to New Jersey, and, if so, does allocation result in a double counting of receipts;
5. Should all of Telecom’s receipts be allocated to New Jersey;
6. Should the allocation to New Jersey of receipts of UPSCO, AF, and WWF be determined based on aircraft departures from New Jersey as compared to all departures or may the Director use a weighting analysis; and
*11 7. Are plaintiffs other than UPSCO subject to late payment and amnesty penalties with respect to any unpaid taxes determined to be due and owing.
I will address each of these issues individually, and, in the decision of each issue, I will set forth (i) the factual background specifically relevant to the issue and (ii) the contentions of the parties as to the issue. Issues (1), (2) and (3) will be discussed in Section A below entitled “Imputation of Interest.” Each of the remaining issues will be discussed, in order, in sections B, C, D, and E, respectively.
IV.
General Factual Background
The UPS Group is engaged primarily in the business of the time-specific delivery of small packages and documents, both domestically and internationally. During the time periods at issue, America was the parent corporation and the other members of the Group, including all plaintiffs, were wholly-owned subsidiaries. America had few, if any, independent functions and primarily served as a holding company with respect to the other UPS Group members. The subsidiary entities comprising the remainder of the Group, were divided into subgroups, each of which had a different function. One subgroup consisted of internal service companies that provided ancillary and support services to other Group members. GS and Telecom were members of this subgroup. Another subgroup consisted of companies that transported packages and documents. UPSCO, AF, and WWF were members of this subgroup.
The primary function of GS was to provide certain centralized management services to other members of the UPS Group. These services included, but were not limited to, management, finance, tax, information systems and data processing, and strategic planning services. GS acted pursuant to a Management Services Agreement (“MSA”) between GS and America. This agreement represented a subcontracting by America of management services that it had agreed to provide to operating subsidiaries in the UPS Group pursuant to a document entitled Business Services Agreement (“BSA”). Under the BSA, each operating *12 company was obligated to pay America, during the years at issue, a monthly fee of five percent of “the gross delivery income” of that company “for each calendar month during the life of [the BSA].” As compensation for its services, GS received from America, during the years at issue, a fee (“business services fee”) of five percent of GS’s “actual disbursements for labor, materials and expenses required or incurred by [GS]” in the performance of its obligations under the MSA. The fee was payable monthly.
Telecom provided communication services in connection with the data processing services performed by GS as part of its centralized management responsibilities.
UPSCO owned or leased and operated the aircraft used to transport packages and documents in accordance with instructions from AF or WWF. Until June 30, 1992, AF was responsible for domestic package and document services, and WWF was responsible for international services. As of July 1, 1992, AF was merged into WWF. WWF (and, when in existence, AF) received packages and documents to be transported by air. For purposes of picking up and delivering those packages and documents to it, AF and WWF utilized the services of two other members of the UPS Group, one a New York corporation and the other an Ohio corporation. These corporations also operated drop-off facilities for packages and documents. Once a package or document was received by AF or WWF, the corporation arranged for air transport using the services of UPSCO, and then for ground delivery of the package or document to the addressee using the services of the New York or Ohio corporation. AF or WWF received the payment from the customer for transport of a package or document and then paid the New York or Ohio corporation and UPSCO for their respective services.
V.
Applicable Legal Principles
In deciding the issues before me, I will apply the following general legal principles. The first is that the Director’s assessments are entitled to a presumption of validity. Our Supreme *13 Court set forth this principle in Atlantic City Transportation Co. v. Director, Div. of Taxation, 12 N.J. 130, 146, 95 A.2d 895 (1953), citing Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952). Aetna Life was a property tax matter in which the Court recognized that a property tax assessment was presumptively valid. In Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, 495 A.2d 1308 (1985), our Supreme Court relied on Aetna Life in establishing the following standard of proof necessary to overcome the presumption:
The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has been long settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be definite, positive and certain in quality and quantity to overcome the presumption.
It is clear that the presumption is not simply an evidentiary presumption serving only as a mechanism to allocate the burden of proof. It is, rather, a construct that expresses the view that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law.
[Id. at 413, 495 A.2d 1308 (citations and internal quotation marks omitted).]
Our Appellate Division has applied the Pantasote standard to appeals involving assessments of state taxes resulting from the audit of cash businesses. Yilmaz, Inc. v. Director, Div. of Taxation, 23 N.J. Tax 361, 366 (App.Div.2007). Based on the Supreme Court’s citation of Aetna Life in its Atlantic City Transportation decision and on the evolution of the Aetna Life standard of proof through Pantasote and Yilmaz, Inc., I will apply the same standard in each of these matters even though none of the plaintiffs operated a cash business such as that at issue in Yilmaz, Inc.
A second general legal principle is that the Director’s regulations are presumptively valid and should receive deference from a court unless they are inconsistent with the provisions of the statute they interpret. Koch v. Director, Div. of Taxation, 157 N.J. 1, 8, 722 A.2d 918 (1999); Richard’s Auto City, Inc. v. Director, Div. of Taxation, 140 N.J. 523, 530, 659 A.2d 1360 (1995). Here plaintiffs do not challenge the validity of any applicable regulation. Consequently, I will accord the regulations appropriate deference.
*14 A third general legal principle is that taxpayers are bound by the tax consequences of their business decisions. This principle was set forth by our Supreme Court in General Trading Co. v. Director, Division of Taxation, 83 N.J. 122, 416 A.2d 37 (1980), where the Court adopted the following language from the United States Supreme Court’s decision in Commissioner v. National Alfalfa Dehydrating and Milling Co., 417 U.S. 134, 148, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717, 727 (1974):
This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not ..., and may not enjoy the benefit of some other route he might have chosen to follow but, did not. “To make the taxability of the transaction depend upon the determination whether there existed an alternative form which the statute did not tax would create burden and uncertainty.”
[General Trading, supra, 83 N.J. at 136-37,416 A.2d 37.]
Creating a corporate structure, with one parent corporation and numerous wholly-owned subsidiaries, constitutes a business decision producing tax consequences that are binding on the corporate entities.
We are not told why [the taxpayer] employed subsidiaries. A probable motivation was tax advantage somewhere. The question is whether a state must adjust its tax laws to avoid a disadvantage a taxpayer may experience because of its decision to incorporate a part of its operation. As a general proposition, the answer must be that it is for the taxpayer to make its business decisions in the light of tax statutes, rather than the other way around.
[Household Finance Corp. v. Director, Div. of Taxation, 36 N.J. 353, 362, 177 A.2d 738 (1962) (citations omitted).]
VI.
Discussion and Analysis of Issues
A. Imputation of Interest
(1) Cash Management System (GS, Telecom, UPSCO, AF, and WWF)
As part of the centralized management structure established by the BSA and MSA, the UPS Group utilized a cash management system. The operation of this system involved the daily transfer or “sweeping,” into a bank account maintained by America, of all *15 cash (other than minimum balances) deposited in the respective bank accounts of the other members of the Group, including all plaintiffs. Amounts swept into America’s account for which there was no immediate need were transferred to a subsidiary known as UPICO which invested the funds in short term instruments and obligations for America’s benefit. America used the funds swept into its account to pay expenses of the subsidiary corporations, including plaintiffs. The payment mechanism required the subsidiary incurring an expense or obligation to notify GS of the amount owed. GS then requested from America the funds necessary to pay the expense, and America transferred the funds to GS. GS either paid the expense directly on behalf of the subsidiary or transferred the funds to the subsidiary to be used for the required payment.
In terms of accounting entries, when obligation of an operating company arose, GS increased (credited) an account payable by the amount of the obligation and increased (debited) by the same amount[2] an intercompany account to which I will refer as “Due From Parent.”[3] When payment was required with respect to the obligation, GS requested the necessary funds from America, and, when funds were received, GS increased (debited) its cash account and decreased (credited) the Due From Parent account. When the funds were remitted to the payee, GS reduced (credited) its cash account and reduced (debited) the appropriate account payable.
The funds provided by America for payment of a particular subsidiary’s expenses or obligations may have been less than, equal to, or more than the cash swept into America’s account from *16 that subsidiary. America treated the cash sweeps as fungible among the subsidiaries, so that cash from one subsidiary could be used to pay the expense or obligation of another. Other than in connection with payment of their respective expenses, the subsidiaries had no right to obtain the return of funds swept from their bank accounts into America’s account, and had no interest in, or right to receive, any of the investment returns generated by EPIC.
Plaintiffs did not produce, and their witnesses could not identify, any documentation establishing or describing the cash management system. The procedures for the sweeping of funds from a subsidiary’s bank account to America’s bank account apparently were undocumented other than by the appropriate banking entries. No promissory notes or other evidences of indebtedness were signed by America with respect to the funds swept into its account, no repayment schedules were established, no interest payments were required from or made by America, and America provided no collateral to any of the subsidiaries. In then- respective New Jersey CBT returns (using the CBT-100 form), plaintiffs GS, Telecom, F, and WOW reported the sweeps in Schedule B (the corporate balance sheet) in Line 24 entitled “Loans from stockholders/affiliates.”[4] The amounts were reported as negative amounts, thus indicating loans to stockholders, that is, to America. Plaintiffs did not report any interest income with respect to the loan amounts. When the auditor from the New Jersey Division of Taxation questioned plaintiff Telecom about its “loans” to America, Telecom responded with a list designating as intercompany receivables the respective amounts reported in Line 24 of Schedule B, and setting forth interest rates and interest amounts.
*17 Because GS, Telecom, F, and WOW did not report any interest income in connection with the loans to America shown on their respective CBT-100 returns, the Director, pursuant to N.J.S.A. 54:10A-10 and N.J.A.C. 18:7-5.10(a)5, imputed interest with respect to the loan amounts. The Director used the average of the beginning of tax year and the end of tax year loan balances shown in Line 24 of Schedule B in each plaintiffs return and multiplied the average amount by the federal blended interest rate applicable to the tax period in question.
Plaintiffs assert that a centralized cash management system is common in large corporate structures and that the UPS Group system did not involve loans. Plaintiffs emphasize the lack of any loan documentation, the absence of repayment schedules or due dates, the absence of collateral, and the inability of the subsidiaries to obtain the return to them of cash not used to pay their expenses or to receive amounts earned from investment of the cash. None of plaintiffs contends that the cash sweeps constituted dividends to America or payments for goods or services provided by America.
In their post-trial briefs, plaintiffs characterized the sweeps as “in the nature of equity” and “capital in nature.” They have not explained these characterizations and have not contended that, in exchange for having its cash swept up to America, GS, Telecom, F, or WOW received an equity interest in America. As explained above, these plaintiffs were wholly-owned subsidiaries of America. Consequently, the phrases “in the nature of equity” and “capital in nature” appear to be misnomers used to camouflage plaintiffs’ position that the cash management system was simply a method for efficient money management, without significance for the purposes of CBT liability.
No reported New Jersey decision addresses the tax consequences of a cash management system such as that used by the UPS Group. In support of their contention that the system did not involve loans, plaintiffs rely on decisions of the federal courts involving centralized cash management in the context of federal *18 income tax litigation and on a decision of the Appeals Court of Massachusetts.
The federal eases on which plaintiffs rely considered whether cash transferred from subsidiary corporations to the bank account of their parent constituted a dividend. In Alternan Foods, Inc. v. United States, 505 F.2d 873 (5th Cir.1974), the parent corporation, Alderman Foods, had approximately fifty-two wholly-owned corporate subsidiaries, each of which owned and operated one or more retail supermarkets. Alderman Foods had a written contract with each subsidiary pursuant to which the subsidiary agreed to “advance” to its parent “such funds as [Alderman Foods] may require which will be credited to [the subsidiary’s] account.” Id. at 875. In practice, each subsidiary transferred all monies to Alderman Foods on a weekly or bi-weekly basis except funds needed for immediate operating expenses such as payroll. Alderman Foods used the funds to pay the subsidiaries’ respective expenses, but also used the funds to pay its own expenses in connection with its operation of a tacking business, a real estate holding company, and a wholesale grocery business selling to independent supermarkets, restaurants, and public institutions.
The issue before the court was “whether or not [the] advances [from the subsidiaries to Alderman Foods] were in fact genuine loans,” id. at 875, as contended by Alderman Foods so that it would have no income tax liability as a result of the advances. The Internal Revenue Service (“IRS”) treated the advances to Alderman Foods as dividends. The court noted that the “central issue here is the factual one of whether there was a definite intent to repay the advances!,]” ibid., and used several factors as indicia of whether the transfers of funds were loans or dividends. The court noted, however, that the factors were not of equal significance and that no one factor was controlling. Id. at 876 n. 6, 877. Among the factors considered were: the extent of control by the shareholder, the earnings and dividend history of the entity from which the funds were transferred, whether security was given by the shareholder, whether there was a maturity date on which repayment was required, whether the parties documented a loan *19 transaction, and whether the shareholder ever attempted to repay. Id. at 877 n. 7.
In holding that the advances were dividends, the Fifth Circuit Court of Appeals found that the amounts of the advances continued to increase, that no duty to repay or repayment schedule existed, that no interest charges were imposed by the subsidiaries, and that no collateral was provided by the parent-shareholder. The court also found that the advances were “used for the general operating expenses of Alderman,” id. at 879, including use to form new subsidiaries. The court concluded: “In our view the evidence overwhelmingly established the intention of Alderman to receive the proceeds from its subsidiaries with no genuine intention to repay.” Ibid.
The United States Court of Claims reached the same result for essentially the same reasons when Alderman Foods appealed a tax deficiency assessed by the IRS for tax years 1966 through 1974. Alterman Foods, Inc. v. United States, 222 Ct.Cl. 218, 611 F.2d 866 (1979). The earlier decision by the Fifth Circuit involved only tax year 1965. The Court of Claims adopted the unpublished opinion of the trial judge as its ruling. In his opinion, the trial judge discussed the Fifth Circuit’s Alterman Foods opinion and made the following comment with respect to the factors used by that court:
To these factors might be added the treatment of the advances in corporate financial statements and tax returns; whether interest was charged or paid on the balances; and in some instances, the use to which the shareholder put the advances.
[Id. at 869 (citations omitted). ]
The trial judge also noted that “[i]n a case of complete identity between corporation and stockholder the books are a self-serving arrangement by the taxpayer calling for scrutiny for possible evasion of taxes.” Id. at 870. The judge then rejected the characterization of the advances as loans in Alderman Foods’ corporate books. The court acknowledged that the payment of subsidiary corporation expenses by Alderman Foods “had the same effect as a partial repayment of a debit balance,” id. at 872, but found that the parent corporation never transferred cash to a *20 subsidiary “solely for the purposes of offsetting a debit balance.” Ibid.
The Appeals Court of Massachusetts concluded that advances from subsidiaries to their parent as part of a cash management system were dividends and not loans in New York Times Sales, Inc. v. Commissioner of Revenue, 40 Mass.App.Ct. 749, 667 N.E.2d 302 (1996). There, the New York Times Company, the parent corporation, established a cash management system for use with New York Times Sales, a wholly-owned subsidiary, and forty-six other subsidiaries. Pursuant to the system New York Times Sales directed its customers to remit payments to certain lock boxes. On a daily basis, the amounts in the lock boxes were transferred to a bank account of the New York Times Company, which used the funds to pay the expenses and payroll of New York Times Sales. Amounts not required for these purposes were retained by the parent corporation “for use in fulfilling its various corporate purposes.” Id. at 305. No promissory notes were issued by the parent, it provided no security for repayment, it paid no interest, and New York Times Sales never sought repayment of the portions of the advances not used to pay its expenses and payroll. The Massachusetts Commissioner of Revenue had treated the transfers of funds as loans on which interest should be imputed. The Appellate Tax Board accepted the argument by New York Times Sales that the transfers should be treated as dividends. In affirming the Appellate Tax Board, the Massachusetts court focused on the intent of the parties and considered the factors set forth in the Alterman Foods decisions.
In Fin Hay Realty Co. v. United States, 398 F.2d 694 (3rd Cir.1968), a decision not cited by plaintiffs, the taxpayer argued that funds advanced to it by its principal stockholders were loans and not contributions to capital. The Third Circuit Court of Appeals held that the advances were contributions to capital and denied the taxpayer a deduction for interest paid. The court considered factors similar to those set forth in the Alterman Foods decisions, and described the factors as “only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely *21 subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship.” Id. at 697. The court further concluded that, when applying an objective test of economic reality, “it is useful to compare the form which a similar transaction would have taken had it been between the corporation and an outside lender____” Ibid. In holding that the advances were capital contributions, the court disregarded “all the formal indicia of an obligation [that] were meticulously made to appear,” ibid., and looked to the use made by the corporation of the monies transferred to it by its stockholders to purchase the corporation’s original assets.
The following common themes emerge from the foregoing decisions with respect to determining whether monetary transfers from one corporation to related corporation, as part of a cash management system, constitute loans:
1. the most important consideration is the intention of the parties;
2. no one of the various factors used to identify a loan is decisive, and the factors are only aids or guides to a decision;
3. internal corporate accounting records have little significance; and
4. the economic reality of the transaction should be considered as if independent unrelated entities were involved.
After applying those themes to the facts presented here, I conclude that the Director reasonably determined that the money transfers made pursuant to the UPS Group cash management system were loans on which interest should be imputed. I reach this conclusion by considering (together with the other factors discussed below) how the UPS Group cash sweeps would be treated for tax purposes if each plaintiff were an independent corporation unrelated to America. In these circumstances, funds transferred from GS, Telecom, F, or WOW to America would constitute, for tax purposes, either contributions to capital, dividends, payments for goods or services, or loans. Transfers of funds between independent corporations could not be treated as “in the nature of equity” or “capital in nature,” when, as a result of the transfers, the transferors received no equity interest in the transferee. Transfers of funds from a corporation to an independent corporate stockholder might constitute dividends if the trans *22 feror had sufficient earnings to warrant dividend payments. The parties presented no proofs as to whether the transfers from GS, Telecom, F, and WOW could have constituted dividends and neither the Director nor GS, Telecom, F, or WOW contends that the cash sweeps to America were dividends. Similarly, neither the Director nor any of these plaintiffs contends that the sweeps were payments for goods or services.
As explained above, each plaintiff reported the cash sweeps as loans to America on Line 24 of Schedule B of its CBT-100 returns and did not include in the returns any statements explaining that the amounts so reported were transfers pursuant to the UPS Group cash management system. Line 26 of Schedule B was entitled “Other liabilities (attach schedule).” One of plaintiffs’ witnesses acknowledged that the cash sweeps could have been reported in this line with an attached explanatory statement and that such a statement could have been included with respect to Line 24. Plaintiffs elected not to provide explanatory statements and elected to file their respective CBT-100 returns reporting the cash management system cash sweeps as loans to America. Their decisions as to tax reporting are consistent with Telecom’s submission of proposed interest rates and amounts in response to the Director’s inquiries concerning that entity’s loans to America.
As the eases discussed above hold, the intention of the parties is the major determinant of whether a transfer of funds constitutes a loan. The transfers from GS, Telecom, AF, and WWF to America did not satisfy most of the factors used in those cases to indicate an intention to make a loan. The cash sweeps were not documented as loans, America provided no security for repayment, no repayment schedules were established, and plaintiffs made no demands for repayment other than for payment of their respective expenses and obligations. However, neither America nor GS, Telecom, AF, or WWF intended that the cash sweep amounts would be available to America for its own purposes. The cash was to be used to pay plaintiffs’ respective expenses and each of them had access to the entire amount of cash swept from it for use in paying its expenses. If the amount swept from one of them exceeded its expenses, the excess could be used at a later date to *23 pay the same plaintiffs expenses. Because America did not segregate the cash swept from a particular plaintiff, the amount swept from one might be used to pay the expenses of another. Under these circumstances, each plaintiff properly can be viewed as having made demand loans to America.
The UPS Group cash management system is distinguishable from that considered in Alternan Foods where the parent used funds from the subsidiaries for the conduct of business activities unrelated to the subsidiaries. The UPS Group system also is distinguishable from that discussed in New York Times Sales. There the court found that a portion of the monies transferred to the parent corporation were not used for the benefit of the subsidiary. The cash swept from plaintiffs to America was dedicated to use for the benefit of plaintiffs and perhaps other members of the UPS Group. The very short term investments of the monies by America with UPICO were consistent with this conclusion because they reflected the need to have the funds immediately available to pay expenses of the transferor or other members of the UPS Group.
The reporting by GS, Telecom, AF, and WWF of the cash sweeps pursuant to the cash management system as loans to America in their respective CBT-100 returns does not conclusively establish that the cash sweeps were loans. However, because the sweeps could have been reported differently, the decisions to report them as loans are significant, especially when viewed in light of Telecom’s apparent acknowledgement of the loan status of the cash sweeps in its response to an inquiry from a New Jersey Division of Taxation auditor. The importance of a taxpayer’s reporting position was described by the United States Tax Court as follows:
We also note that a taxpayer generally is not allowed to argue that the substance of a transaction was other than the form he chose. The substance-over-form argument is always available to respondent, but it is available to taxpayers only on a limited basis. The rationale has been stated as follows:
As a general rule, the government may indeed bind a taxpayer to the form in which he has factually cast a transaction. The rule exists because to permit a taxpayer at will to challenge his own forms in favor of what he subsequently asserts to be true “substance” would encourage post-transactional tax-planning and unwarranted litigation on the part of many taxpayers and raise a monumental administrative burden and substantial problems of proof on the part of the government.
*24 [J.A.Tobin Construction Co. v. Comm’r, 85 T.C. 1005, 1021, 1985 WL 15424 (1985) (quoting from In re Steen, 509 F.2d 1398,1402-03 n. 4 (9th Cir.1975).)]
As discussed above, plaintiffs do not contend that the cash sweeps were payments to America for goods or services or that the transfers were dividends. The sweeps did not constitute equity investments by plaintiffs in their parent corporation, America. Transfers of funds from one corporate entity to another with the intention that the funds be used for the benefit of the transferor do not constitute transactions without legal significance or tax consequence. America, GS, Telecom, AF, and WWF elected to structure their relationships as separate corporations doing business with each other. They are bound by the tax consequences of that election. Household Finance Corp. v. Director, Div. of Taxation, supra, 36 N.J. 353, 362, 177 A.2d 738. Specifically, plaintiffs cannot be treated, in effect, as divisions of America for purposes of the tax consequences of the cash management system and as independent corporations for all other purposes. The Director, therefore, reasonably concluded that the cash sweeps pursuant to the UPS Group cash management system should be treated as loans and properly imputed interest with respect to these loans pursuant to the authority granted by N.J.S.A. 54:10A-10 and N.J.A.C. 18:7-5.10(a). As to plaintiffs Telecom, AF, and WWF, the amounts of the loans equal the negative amounts reported on Line 24 of Schedule B in their respective CBT-100 returns for the years in issue as to each of them. As to plaintiff GS, the following subsection of this opinion analyzes and quantifies the portions of the amounts it reported on Line 24 of Schedule B in its CBT-100 returns that constituted loans to America.
(2) “Warehoused” Liabilities (GS)
The loans to America that GS reported on Line 24 of Schedule B of its CBT-100 returns included certain liabilities carried by GS on behalf of other subsidiaries as part of its centralized management responsibilities.[5] The aggregate amounts of these loans as of the end of each year were the following:
*25 1991 $ 443,857,564
1992 $ 459,524,471
1993 $1,700,579,215
1994 $ 883,614,448
1995 $1,116,225,781.
The Director imputed interest using the average federal funds rate for the particular tax year, applied to the average of the loan balances for the beginning and end of each year.[6]
GS asserts that the liabilities of other members of the UPS Group were being “warehoused on the books of GS,” and did not constitute loans notwithstanding that GS reported them as such on its CBT-100 returns. In a letter to the New Jersey Division of Taxation, the state and local tax manager at GS during the period 1991 through 1995 described the warehoused liabilities as including projected amounts to cover health care costs for retirees accrued on the GS books pursuant to Financial Accounting Statement (“FAS”) 106, as well as “such items as health and welfare expense; FAS 87 pension and retirement expense; general insurance and general liability expense; district rents; fire insurance premiums; employee awards; uniforms; plant and office supplies; quarterly payroll taxes; railroad claims reimbursement; fixed asset transfers; and numerous others.” In the letter, the tax manager provided the following explanation for the use of this system:
UPS centralizes these liability accounts on the books of UPS-GS, rather than recording them individually on the books of the various subsidiaries that actually incur them. This is done for purposes of management and control because only UPS-GS has personnel with the necessary management, financial, and other expertise to properly minimize and control these liabilities. This is pursuant to UPS-GS’s role to provide centralized management services to the UPS organization. The actual expenses associated with these transactions (e.g. insurance, health *26 and welfare benefits, pensions, etc.) are recorded properly by each individual company to which the expense pertains. UPS-GS does not record expenses attributable to the other companies.
This letter also contained a lengthy explanation of the centralized accounting for post-retirement health benefits that were required to be accrued under FAS 106. The letter recounted discussions with the conferee at the New Jersey Division of Taxation that resulted in a deduction of these accrued post-retirement health benefits from the amount of the “loan” as to which interest was imputed. The letter asserted, and GS contends, that, although the GS balance sheet showed the “accumulated post-retirement benefits” in a separate line, the “accumulation of multiple types of liabilities” was based on the same accounting principles and, therefore, like the FAS 106 benefits, should not be treated as a loan on which interest can be imputed. The Director did not agree with GS’s characterization of these “multiple types of liabilities,” treated them as loans to America, and imputed interest.
GS presented the testimony of an accounting expert who opined that the warehoused liabilities were not loans because, as contrasted with the cash management system transactions, the warehousing involved no transfer of funds.[7] The accountant and other GS witnesses testified that money was paid out with respect to the liabilities only as and when required. The subsidiary whose liability was paid had no use of the funds reflected in the accounting entry, no obligation to reimburse GS for the amounts paid by GS, and GS had no right to payment from the subsidiary whose liability GS paid. The Director relies on GS’s reporting of the warehoused liabilities as loans to America on GS’s CBT-100 returns as supporting the imputation of interest.
GS asserts that the accounting entries it makes in connection with its warehousing of liabilities confirm that the warehousing did not involve loans. The entries were as follows. Once the appro *27 priate amount of one of the warehoused items was determined, the appropriate account payable line on the liabilities side of the GS balance sheet was increased (credited), and the Due From Parent line on the assets side of the balance sheet was increased (debited) in the same amount.[8] When payment was required in connection with a warehoused liability, GS requested and received the necessary funds from America, and increased (debited) the cash line on the assets side of its balance sheet and decreased (credited) the Due Fi’om Parent line in the same amount. When GS remitted the money to the obligee, it decreased (credited) cash on the assets side of its balance sheet by the amount of the payment and decreased (debited) by the same amount the appropriate account payable on the liabilities side of its balance sheet.
I find and conclude, based on the preceding discussion, that GS did, during the period 1991 through 1995, warehouse liabilities on behalf of other members of the UPS Group as part of a centralized management function under the BSA and MSA. I further find and conclude that the warehousing process did not involve, constitute, or generate loans from GS to America or to any other member of the UPS Group. Consequently, interest should not have been imputed on these warehoused liability amounts.
The amounts reported by GS on its CBT-100 returns as loans to America included but were not limited to the warehoused liabilities. The components of the reported “loans” were analyzed and partially quantified by the accounting expert mentioned above. The expert’s assigned task was to analyze the Due From Parent line on GS’s balance sheets (containing the amounts reported as loans to America on GS’s CBT-100 returns) and determine whether the amounts shown in that line constituted loans. For purposes of his analysis, the expert examined GS’s accounting records and determined that the Due From Parent entries could be divided into amounts attributable to liabilities warehoused by GS for other UPS Group members and amounts relating solely to GS. The *28 following table summarizes the accountant’s analysis (in thousands of dollars):
Year (End of Year) Total Due from Parent Warehoused Liabilities GS
1991 $ 443,857 $351,941 $ 91,916
1992 $ 459,524 $325,752 $133,772
1993 $1,007,579 $810,554 $197,025
1994 $ 833,614 $596,049 $237,565
1995 $1,116,226 $871,246 $244,980
Contrary to the assertions by GS that its Due From Parent line consisted only of warehoused liabilities, the accountant determined that the GS portion of the Due From Parent line included two components: (i) cash received by GS from outside sources such as repayments of employee loans, tax refunds and vending rebates which cash was swept up to America under the UPS Group cash management system, and (ii) accrued but unpaid business services fees due to GS from America pursuant to the MSA. The accountant did not quantify either component of the GS portion of the Due From Parent line. He attributed the five percent business services fee component to a timing differential between the accruing of the fee by GS on a monthly basis and the actual payment of the fee by America at later dates only as GS paid operating expenses of other members of the UPS Group. The accountant characterized the accrued amount as a “trade receivable” of GS “equal to 2 to 3 months” of business services fees. He did not quantify the portion of the amount representing a one month receivable, a two month receivable, or a three month receivable.
I find the accountant’s analysis to be thorough and reliable and accept it for purposes of this opinion. The Director presented no expert testimony to challenge the accountant’s analysis and conclusions.
The Director’s regulation governing imputation of interest provides, in pertinent part, as follows:
*29 I have already decided that the Director reasonably determined that amounts swept up to America under the UPS Group cash management system constituted loans as to which the imputation of interest was proper under the first sentence of this regulation.[9] Under the second sentence, interest on trade receivables is to be charged beginning on the first day of the third month after the receivable arises. Neither GS’s accounting expert nor any other witness quantified the components of the GS portion of the Due Prom Parent line. Therefore, even if I accepted the expert’s characterization of the business services fee component of the Due From Parent line as a trade receivable, I could not determine either the amount or the age of the “trade receivable” included for any year. I have some doubt as to the accuracy of the expert’s characterization. GS’s tax manager testified that the business services fee was recorded as an intercompany journal entry and no cash payment ever was made by America to GS. Under these circumstances, the amounts of the recorded but unpaid fees could be deemed loans by GS. I need not resolve this issue, however, for the reasons set forth below.
GS had the burden of overcoming the presumption that the Director’s assessments of imputed interest were correct. In the absence of a quantification of each component of the GS portion of the Due Prom Parent line and in the absence of an aging analysis of the business services fee component, I find and conclude that GS failed to carry its burden. It did not establish that the amounts attributable to it (and not to its “warehousing” function) that were recorded on its balance sheet as Due From Parent, and reported in its CBT-100 returns as loans to America, were other than as reported in the returns. I hold, therefore, that the Director’s imputation of interest was proper as to the following amounts:
*28 Under N.J.S.A. 54:10A-10(b) interest should be charged on loans or advances made by one related party to another from the day after the debt arises until the debt is satisfied. With respect to intercompany trade receivables of related taxpayers, interest is not required to be charged on an intercompany trade receivable before the first day of the third calendar month.
[N.J.AC. 18:7-5.10(a)5.]
*29 1991 $ 91,916,000;
1992 $133,772,000;
*30 1993 $197,025,000;
1994 $237,565,000;
1995 $244,980,000.
In reaching this conclusion, I have considered the opinion of plaintiffs’ accounting expert that the amounts in GS’s Due From Parent line were not loans based on his determinations that: (1) GS’s retained earnings were its “only financial resources” from which it could make loans; and (2) the retained earnings shown on GS’s balance sheets were inadequate to enable it to make loans in the amounts reported. The expert made these determinations with respect to the total amount of the Due From Parent line for each year in issue. Presumably, his analysis would be the same as to the GS portion only.
I reject the expert’s analysis, insofar as it applies to the GS portion of the Due From Parent line, for the following reasons. Retained earnings of a corporation are defined as:
equal to its net profits, income, gains and losses from the date of incorporation or from the latest date when a deficit was eliminated by application of its capital surplus or stated capital or otherwise, after deducting subsequent distributions to shareholders and transfers to stated capital and capital surplus----
[D.R. Carmichael et al.,] Accountants’Handbook, Volume I: Financial Accounting and General Topics § 27.7(a) (11th ed.2008).
Retained earnings are affected only by certain transactions or activities of the corporation. These are: prior period adjustments; dividends; recapitalizations and reorganizations; treasury stock transactions; and stock redemptions. Id. at § 27.7(b). See also Dictionary of Accounting 118 (2nd ed.1995) (defining retained earnings as “[t]he amount of earnings retained (reinvested) in a corporation and not distributed to stockholders in the form of dividends.... ”); Black’s Law Dictionary 548 (8th ed.2004).
As the foregoing definitions indicate, the transactions that affect retained earnings do not include loans. The accounting entries for a loan would both be on the asset side of the corporate balance sheet. When a loan is made, the loan receivable line would be increased (debited), and the cash line would be decreased (credited). Retained earnings would not change. Thus, from the standpoint of accounting entries, the amount of retained earnings would *31 have no effect on a corporation’s ability to make a loan. Dividends reduce retained earnings, loans do not.
The conclusion of plaintiffs’ expert, based on the amounts of retained earnings shown on GS’s balance sheets for the years in issue, that GS lacked the financial resources to make substantial loans to America not only is inconsistent with the accounting entries made in recording a loan transaction but also is irrelevant to the particular components of the loans comprising the GS portion of the Due From Parent line. Those components consisted of cash swept up to America as part of the UPS Group cash management system and amounts representing unpaid business services fees. As to the cash management system, GS was not providing funds in excess of its actual cash receipts. The accounting entries in connection with the cash sweeps demonstrate that the cash management loans had no impact on retained earnings. When GS received cash it increased (debited) the cash line on the asset side of its balance sheet and increased (credited) retained earnings on the liabilities side of its balance sheet. When the cash was swept up to America, GS decreased (credited) its cash line and increased (debited) the Due From Parent line also on the asset side of its balance sheet. No entry relating to retained earnings was necessary.
The business services fee component of the Due From Parent (loans to America) line did not involve the actual advance of funds from GS or the depletion of any other of GS’s financial resources. When GS recorded the monthly management fee, it increased (debited) the Due From Parent line on the asset side of its balance sheet and increased (credited) retained earnings. When the fee was paid, GS decreased (credited) the Due From Parent line, and increased (debited) cash. Retained earnings remained unchanged.
The economic reality of the business services fee component of GS’s Due From Parent line is that this component represented indebtedness from America to GS. Under the Director’s regulation, interest was to be imputed during the period of non-payment, commencing on “the day after debt arises” or on “the first day of the third calendar month after the trade receivable arises.” If GS *32 had quantified the amounts of business services fees included in the Due From Parent line, and had established the periods of deferral and the amount deferred for each period, and if I treated the accrued but unpaid management fees as trade receivables, then, perhaps, as to some amounts, interest would not be imputable until the first day of the third month after GS charged the business services fee to America. However, as discussed above, GS provided no such proof, and, consequently, I have concluded that the Director reasonably treated the accrued amounts as loans.
(3) Deduction of Imputed Interest (UPSCO)
In line 24 of Schedule B of its CBT-100 returns, for each of the years 1991 through 1995, UPSCO reported loans from stockholders (i.e., America). For tax years 1993 and 1994, it reported and deducted interest payments with respect to the loans. For tax years 1991, 1992, and 1995, however, it reported no interest payments. The Director determined, pursuant to N.J.S.A. 54:10A-10 and N.J.A.C. 18:7-5.10(a)5, that interest should be imputed in connection with these loans.
Because the Director determined that the interest rate reflected in UPSCO’s 1993 and 1994 returns was below the arms length rate that would be charged between unrelated parties, the Director imputed interest for those years as well as years 1991, 1992, and 1995. For each year, the Director calculated imputed interest by applying the blended annual interest rate used by the IRS. For 1993 and 1994, the Director incorporated, in the imputed interest, the interest amounts reported by UPSCO for all years. The Director then disallowed deduction of ninety percent of the imputed interest in adjusting UPSCO’s CBT-100 returns. These adjustments to UPSCO’s interest expense deductions did not result in the imposition of any additional tax.
UPSCO has failed to explain the nature of the loans from America reported by it on Line 24 of Schedule B of its CBT-100 returns. Although it has made vague comments concerning the impropriety of the Director’s imputation of interest, UPSCO’s only *33 real objection to the Director’s adjustments appears to be that the computation of the non-deductible portion of the imputed interest for tax years 1993 and 1994 was incorrect. UPSCO does not challenge the Director’s disallowance of the deduction of ninety percent of the correct imputed interest amount. Any such challenge would be without merit because, as discussed above, N.J.S.A. 54:10A-10 and N.J.A.C. 18:7-5.10(a)5 permit the Director to impute interest, and N.J.S.A 54:10A-4(k)(2)(E), as in effect during the years 1991 through 1995, expressly prohibited the deduction of “90% of interest on indebtedness owing directly or indirectly to holders of 10% or more of the aggregate outstanding shares of the taxpayer’s capital stock of all elasses[.]” See N.J.A.C. 18:7-5.2(a)lix (reflecting the contents of the statute as to “accounting or privilege periods ending on or before January 10, 1996”).
As to tax year 1993, UPSCO asserts that the amount of imputed interest expense should have been $32,909,731 and the ninety percent deduction disallowance should have been $29,618,758. The New Jersey Division of Taxation audit report showed imputed interest expense of $32,586,638 and a disallowed deduction of $29,618,758. What UPSCO fails to understand is that the imputed interest shown in the auditor’s report was reduced by the $323,095 of interest that UPSCO reported in Schedule F of its 1993 CBT-100 return. However, the auditor allowed a total interest expense of $32,909,731 (the total of the imputed and reported interest). The disallowed deduction of $29,618,758 equals ninety percent of this total amount. Thus the Director’s calculations were correct and in accordance with UPSCO’s records.
For tax year 1994, the Director imputed interest of $58,180,888 in addition to allowing the interest of $104,500 reported by UP-SCO in Schedule F of its CBT-100 return. The disallowed deduction shown in the audit report was $52,456,850. This amount equals ninety percent of the $58,285,388 total of the imputed and reported interest. Again the Director’s computations were correct and in accordance with UPSCO’s records.
*34 B. Allocation of Revenue to New Jersey — DPU Revenue (GS)
As part of its responsibilities under the MSA, GS operated a data processing unit (“DPU”) that provided data processing services to other members of the UPS Group. These services were performed using equipment and employees located at GS’s facility in Mahwah, New Jersey. GS had another facility in Kentucky from which it provided computer equipment to members of the UPS Group and serviced that equipment. GS’s data processing services consisted of processing and storage of data. Rather than charging each of the other UPS Group members using the data processing services for the member’s propoi’tionate share of the aggregate DPU cost for a particular period, GS treated the cost as a shared expense among the users. Although GS initially contended that, and filed its CBT-100 returns as if, these shared expenses should not be treated as revenue to it, GS has conceded, for purposes of these appeals, that the DPU charges do constitute revenue.
GS asserts that all DPU revenue cannot be allocated to New Jersey because part of the revenue related to services performed in, or provided from, Kentucky. GS further argues that, because users of the DPU services were located outside of New Jersey, only a portion of the DPU revenue relating to New Jersey may be allocated to this State for purposes of calculating GS’s receipts fraction. Finally, GS asserts that, if any portion of the DPU revenue is allocated to New Jersey, then GS is entitled to recalculate the portion of the business services fees that it allocated to New Jersey. GS contends that the recalculation is required in order to avoid a double counting of revenue allocable to New Jersey.
I am satisfied from the accounting records produced by GS that its DPU revenue includes amounts attributable to services and equipment provided by or from GS’s Kentucky facility. The records covered twelve months of 1992, 1993 and 1994, and ten months of 1995. GS could not locate the records for 1991 and January and December 1995. I find reliable the records that GS produced segregating the DPU charges attributable to the Mah *35 wah facility from those attributable to Kentucky. I conclude that the amounts attributable to Kentucky must be excluded from the DPU revenue allocated to New Jersey, and, therefore, that the DPU revenue should be allocated as follows (based on GS’s records):
Year New Jersey Kentucky
1992 $175,081,903 -0-
1993 $164,027,609 $ 2,738,805
1994 $253,750,785 $38,048,815
1995 (10 months) $216,384,615 $29,260,818.[10]
In the absence of records as to 1991 and January and December 1995, I find and conclude that the Director acted reasonably in attributing to New Jersey all DPU revenue for those time periods.
The next issue is whether the entirety of the foregoing amounts of revenue attributable to New Jersey should be included in the numerator of GS’s receipts fraction. GS contends that, under the Director’s regulation in effect for the years in issue (1991 to 1995), only portions of the charges should be included. The regulation, N.J.A.C. 18:7-8.10, provided in paragraph (a) that “[Receipts from services performed within New Jersey are allocable to New Jersey.” Paragraph (c) provided as follows:
Where a lump sum is received by the taxpayer in payment for services within and without New Jersey, the amount attributable to services performed within New Jersey is to be determined on the basis of the relative values of, or amounts of time spent in the performance of those services within and without New Jersey, or by some other reasonable method which should reflect the trade or business practice and economic realities underlying the generation of the compensation for sendees. Full details must be submitted with the taxpayer’s return.
[N.J.A.C. 18:7-8.10(c) (1995).]
Paragraphs (a) and (c) of N.J.A.C. 18:7-8.10 were amended in 1997. Paragraph (a) of the amended regulation required attribution to New Jersey of all receipts resulting from a service per *36 formed in New Jersey and included the substance of the provisions formerly comprising paragraph (c). A new paragraph (c) provided that, with respect to “service fees from transactions having contact with this State,” twenty-five percent of the fees were to be allocated to the state of origination, twenty-five percent to the state in which the transaction terminated, and fifty percent to the state in which the service actually was performed.
GS contends that only the pre-1997 version of the regulation is applicable, and that the services producing the DPU revenue were performed “within and without New Jersey” as contemplated by the regulation so that not all of the DPU revenue resulting from data processing services in New Jersey was properly allocable to this State. In support of these contentions, GS relies on two examples contained in paragraph (c) of the earlier regulation and transferred to paragraph (a) by the 1997 amendments. One example, relating to television and radio advertising rates based on the size of the listening audience, states that the portion of the advertising revenue attributable to New Jersey should be “based upon the proportion of [the taxpayer’s] listening audience in New Jersey.” The second example, relating to charges for long distance telephone service billed to the originators of the calls, states that allocation of revenue to New Jersey should be “based upon billing for calls originating in New Jersey.”
GS argues that, under these examples, if the broadcast facilities or long distance switching equipment were located in New Jersey, the revenue allocable to New Jersey would be based on the location of the listeners or viewers of television or radio broadcasts or the location of originators of long distance calls. Thus, GS reasons that its DPU revenue should be treated in an analogous fashion because the users of the service “contact and interact with the equipment [in New Jersey] remotely.”
I conclude that the pre-1997 regulation was controlling for the years 1991 through 1996. I further conclude that Paragraph (a) is applicable to the DPU charges because the data processing services provided by GS were performed in New Jersey and not “within and without” this State. The equipment performing the *37 data processing was located in New Jersey, and the personnel necessary to operate, maintain and repair the equipment also were located in this State. That users of the service having equipment necessary to access the information generated in New Jersey were located outside of this State does not alter the fact that the services producing the revenue subject to tax all were performed within New Jersey.
The significance of the New Jersey location of the data processing equipment is suggested by the two examples included with paragraph (c) in the 1997 version of the regulation. One example relates to the allocation of revenue from ATM services where the taxpayer’s computer equipment that performs credit cheeks is located outside New Jersey, and the other example relates to the allocation of revenue from the provision of on-line internet access where the equipment allowing access is located outside New Jersey. As a result of the location of essential equipment outside this State, transactions occurring in New Jersey, but using equipment located outside this State, have only “contact” with New Jersey and, under the examples, the percentage allocation of revenue set forth in the 1997 version of paragraph (c) applies. I infer from these examples that location of the equipment in New Jersey would have rendered paragraph (c) inapplicable, and paragraph (a) applicable, to the revenue generated by the services.
Remaining for consideration is GS’s contention that, if the DPU receipts are allocable to New Jersey, then the allocation of its business services fee receipts to this State must be adjusted because the fraction used for making such allocation had a numerator producing, in effect, a duplicate allocation of revenue to New Jersey. GS asserts that the receipts it allocated to New Jersey in its CBT-100 returns consisted only of business services fee revenue, because DPU charges were not treated as revenue but as shared expenses. In determining the portion of the business services fee revenue allocable to New Jersey, GS employed a payroll fraction. The numerator of the fraction included all payroll in New Jersey, including the payroll for those individuals engaged in providing data processing services and those providing business services. The denominator of the fraction was the *38 payroll for all GS employees.[11] GS argues that the DPU revenue included an amount attributable to the payroll costs for providing the DPU services. Thus, GS asserts that, if the payroll fraction used to allocate business services fee receipts to New Jersey is not adjusted, then the portion of those receipts allocated to New Jersey by virtue of the inclusion of DPU payroll in the numerator of the fraction, will be taxed twice in this State.
If GS has accurately described its allocation of business services fee revenue to New Jersey in its CBT-100 returns, then the percentage of that revenue allocated to New Jersey should equal the percentage of total payroll allocated to New Jersey, because, under GS’s argument, the same fraction was used to allocate receipts and payroll. GS’s CBT-100 returns for the years in issue do not support its contentions. For example, in tax year 1991, the payroll fraction as calculated in Schedule K (containing the calculation of income allocable to New Jersey) of GS’s CBT-100 return is .385664. Total receipts for that year were reported as $594,131,737. The product of multiplying $594,131,737 by .385664 is $229,135,222. In Schedule K, however, GS reported New Jersey receipts of $229,422,600, reflecting a receipts fraction, of .386148 not .385664. Similar inconsistencies appear in the returns for calendar years 1992 through 1995. For 1995, the payroll fraction was calculated by GS to be .377458. Multiplying that percentage times the total receipts reported of $826,461,834 produces New Jersey receipts of $311,954,631. Part III of Schedule J[12] of GS’s 1995 CBT-100 return, however, reported New Jersey receipts of $311,947,173 reflecting a receipts fraction of .377449 not .377458.
GS presented extensive testimony concerning the precision and accuracy of its accounting records. I find that testimony to be credible. Consequently, I conclude that the foregoing inconsisten *39 eies, although relatively minor, demonstrate that GS has not accurately described its methodology for allocating business services fee receipts to New Jersey. Therefore, GS has failed to carry its burden to establish that the Director’s allocation of those receipts to New Jersey was distorted, and no recalculation of the amounts determined above to be allocable to this State is warranted.
C. Allocation of Revenue to New Jersey (Telecom)
During the period January 1, 1996 through December 31, 1999, Telecom owned communications equipment located within the GS facility in Mahwah, New Jersey. The equipment provided members of the UPS Group and certain customers with a means of access to shipment data. Telecom had no employees, and the equipment was operated by GS employees. The Director allocated one hundred percent of Telecom’s receipts to New Jersey. This allocation is consistent with the one hundred percent property fraction used by Telecom under N.J.S.A. 54:10A-6, reflecting that all of its property was located in New Jersey. Telecom contends, however, that it had no regular place of business in New Jersey, or anywhere else, that it was “little more than an accounting entity,” and, consequently, all of its revenue should not be subject to tax in New Jersey.
For the years in issue, Telecom reported the following gross receipts and New Jersey receipts:
Gross Receipts New Jersey Receipts
1996 $2,783,091 $396,244
1997 $4,401,835 $392,229
1998 $1,244,877 $ 55,344
1999 $1,511,472 $ 93,893.
Telecom presented no proofs as to how the receipts attributed to New Jersey were calculated, other than statements indicating that the attribution related to customer locations. It also presented no proofs as to why the percentage of New Jersey receipts varied from 4.45% in 1998 to 14.24% in 1996.
*40 Under N.J.S.A. 54:10A-6, a taxpayer may allocate only a portion of its total income to New Jersey when the taxpayer “maintains a regular place of business outside this State other than a statutory office[.]”[13] The statute also provided that, for “a taxpayer which does not maintain a regular place of business outside this State other than a statutory office, the allocation factor shall be 100%.”[14] The CBT Act does not require that a corporation maintain a regular place of business in New Jersey for the one hundred percent allocation factor to apply. CBT is imposed on a corporation not for the privilege of having a regular place of business located in New Jersey but
for the privilege of having or exercising its corporate franchise in this State, or for the privilege of deriving receipts from sources within this State, or for the privilege of engaging in contacts within this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State.
[N.J.S.A 54:10A-2]
Based on those statutory provisions, I reject Telecom’s contentions. Under the express language of N.J.S.A. 54:10A-2 and -6, one hundred percent of its income is taxable in New Jersey. Telecom exercised its corporate franchise in New Jersey during the years in issue, derived receipts from sources in this State, did business and owned property in this State.
Telecom asserts that it also paid taxes in twenty-four other states. The returns filed in those states, however, were consolidated returns for the UPS Group. Telecom submitted to the Director a schedule of taxes paid to other states for each of the years in issue, but presented no proofs as to the basis for determining those taxes. By regulation, the Director allowed a credit against New Jersey CBT for taxes paid to a foreign state where a taxpayer was taxable in that state. The regulation provides as follows:
*41 Where the Business Allocation Factor under [N.J.S.A. 54:10A-6] is 100 percent and the taxpayer in fact paid a tax based on or measured by income to a foreign state, resulting in a duplication of income being taxed, it may, under Section 8 of the [CBT] Act, apply for a reduction in the amount of its tax. The reduction is available only where the taxpayer in its own right acquired a taxable status in the foreign state by reference to at least one of the criteria described at N.J.A.C. 18:7-1.6 as if the New Jersey Corporation Business Tax Act were the law of that foreign state.
[N.J.A.C. 18:7 — 8.3 Od).]
In a communication from its attorney to a conferee at the New Jersey Division of Taxation Conference and Appeals Branch, Telecom asserted that the application of the credit would be insufficient to produce proper allocation of Telecom’s tax liability to New Jersey. The letter also stated that “[w]e have made no effort to determine what portion of [the taxes paid to other states] might be subject to credit under N.J.A.C. 18:7-8.3(b).” Telecom presented no proofs as to this issue.
The assertions in the attorney’s letter are hearsay, are not proof, and are wholly inadequate to overcome the presumption that the Director was correct in determining that all of Telecom’s entire net income was taxable in New Jersey. Telecom did not make any meaningful argument as to the existence of a constitutional basis for limiting its tax liability in New Jersey. Consequently, I sustain the Director’s assessments of tax. However, Telecom is entitled to credits under N.J.A.C. 18:7-8.3(b) if it satisfies the requirements of that regulation and establishes that taxes were paid to other states as a result of Telecom’s activities in those states and not as a result of its inclusion in consolidated tax returns filed for the UPS Group.
D. Allocation of Revenue to New Jersey (UPSCO, AF, and WWF)
UPSCO was the entity within the UPS Group which owned or leased and operated the aircraft used for package and document transport during the years in issue. UPSCO operated the following types of aircraft: Boeing 727-100; Boeing 727-200; Boeing 747; Boeing 757; DC 8-71; DC 8-73; and Expediter (a small aircraft used for airports where a jet aircraft could not land). AF and WWF were responsible for arranging for transport of *42 packages and documents and functioned as freight forwarders. AF was responsible for domestic transport and WWF for international transport until July 1992 when AF was merged into WWF.
Although neither AF nor WWF was an airline (that is, neither entity owned, leased, or operated aircraft) during the years in issue, each elected to allocate receipts to New Jersey for CBT purposes by using the Director’s regulation pertaining to allocation of airline receipts. The Director has accepted the application of the regulation to all three entities. The regulation provides in pertinent part as follows:
Certain lump sum payments for services performed within and without New Jersey must be apportioned in the following manner in order to result in a fair and reasonable receipts fraction.
i. Transportation revenues of an airline are from services performed in New Jersey based on the ratio of departures from New Jersey to total departures. Departures may be weighted as to cost and value of aircraft by type where weighting would give a more fair and reasonable business allocation factor.
[AW. AC. 18:7-8.10(c)4.]
All three entities computed their respective allocations of receipts to New Jersey using the departures fraction described in the regulation, based on departures of UPSCO aircraft from Newark International Airport.
The Director sought to determine if the departures fraction fairly allocated receipts to New Jersey. The auditor at the New Jersey Division of Taxation repeatedly requested information as to the “cost and value” of UPSCO’s aircraft. UPSCO, WWF and AF refused to provide the information based on their assertion to the auditor that, in their respective opinions, weighting would not result in a “more fair and reasonable business allocation factor.” These plaintiffs have provided the cost and value information in the context of these appeals, subject to a protective order.
Before or during the audit process, one of these plaintiffs provided information as to UPSCO’s “block hour rates” for the fourth quarter of 1990. These rates reflected the hourly cost of operating each type of aircraft from the time that wheel blocks were removed prior to departure of the aircraft to the time that wheel blocks were inserted after arrival. The rates were adjusted *43 quarterly. Package delivery charges were adjusted on the basis of the adjusted block hour rates.
The operating costs reflected in the block hour rates were not directly proportionate to the respective cargo capacities of the various types of aircraft. This resulted from factors such as the requirement for a three person crew in a Boeing 727, while the much larger Boeing 757 required only a two person crew. Maintenance costs for a three engine Boeing 727 were higher than for a two engine Boeing 757, while fuel consumption per hour was approximately the same for both types of aircraft.
The auditor determined that a weighting analysis, as contemplated by the regulation, was necessary because the cargo capacities of the USPCO aircraft varied greatly which could affect the amount of revenue attributable to New Jersey. She concluded that reliance on the departures fraction could result in a distortion of the amount of receipts properly allocable to New Jersey. Because no other cost and value information was available, the auditor used the fourth quarter 1990 block hour rates to make this analysis, supplemented by internet research as to the cargo capacities of the various types of aircraft.
UPSCO, AF, and WWF assert that the Director’s use of block hour rates for purposes of allocating receipts to New Jersey was improper because: (1) these rates did not reflect the “cost and value” of the aircraft as contemplated by the Director’s regulation, and (2) the block hour rates were not a reasonable basis for determining the revenue generation by each type of aircraft because the rates were not proportionate to the cargo capacity of each type of aircraft. Plaintiffs assert that the Director was required to allocate their respective receipts to New Jersey using the departures fraction set forth in N.J.A.C. 18:7-8.10(c)4(l) unless the Director could demonstrate that a “cost and value” weighting analysis would produce a “more fair and reasonable” allocation.
The Director responds that, because of the varying sizes and cargo capacities of the types of aircraft used by UPSCO, the departures fraction does not and cannot fairly and reasonably *44 reflect revenue properly allocable to New Jersey. The Director asserts that the Division of Taxation was entitled to receive the information the auditor requested as to the cost and value of UPSCO’s aircraft, and that, in light of the plaintiffs’ refusal to provide the information in the context of the audit process, reliance on the only information available reflecting the differences in size among the aircraft operated by UPSCO, namely, the block hour rate sheet for the fourth quarter of the 1990, was appropriate and reasonable.
Plaintiffs have acknowledged that each Boeing 747 aircraft operated by UPSCO had a cargo capacity more than three times that of a Boeing 727, and a Boeing 757 had a cargo capacity almost twice that of a Boeing 727. The aircraft used for a particular shipment was selected by UPSCO based on the cargo capacity required to accommodate the packages and documents being transported. Thus the use of a larger aircraft meant that more packages were being transported, thereby generating more revenue than if a smaller aircraft were used. The potential distortion resulting from the use of the departures fraction under these circumstances is illustrated by the following example. Assume that the UPSCO fleet consisted of ten Boeing 747’s, and ten Boeing 727’s, but only the Boeing 747’s were operated in New Jersey. If there were one hundred New Jersey departures and two hundred total departures, the departures fraction would allocate one-half of UPSCO’s revenue to New Jersey under circumstances where the revenue generating capacity of the aircraft departing from New Jersey was triple that of all departures in other states.
Implicit in the provisions of N.J.A.C. 18:7-8.10(c)4(l) permitting a weighting analysis is the right of the Director to obtain information from the taxpayer that would permit the performance of the analysis. This implicit authority is part of, and consistent with, the Director’s explicit authority to obtain information from a taxpayer set forth in N.J.S.A. 54:10A-10. Paragraph b of this statute provides:
The director may require any person or corporation to submit such information under oath or affirmation, or to permit such examination of its books, papers and *45 documents, as may be necessary to enable the director to determine the existence, nature or extent of an agreement, understanding or arrangement to which this section relates, whether or not such person or corporation is subject to the tax imposed by this act.
[N.J.S.A. 54:10A-10b.]
The Director’s right of access to information is set forth by regulation as well.
The Director may require all taxpayers to keep whatever records [the Director] may prescribe, and [the Director] may require the production of books, papers, documents and other data, to provide or secure information pertinent to the determination of the tax and its enforcement and collection.
¡N.J.A.C. 18:7-11.17(b).]
In the absence of information as to cost and value of UPSCO’s various types of aircraft, the Division of Taxation’s auditor, in performing her weighting analysis, acted reasonably in using and relying on the 1990 block hour rates that UPSCO, AF, and WWF had provided. The block hour rates did not provide a totally accurate indication of the cost and value relationships among the types of aircraft used by UPSCO. The rates were, however, a function of operating costs and therefore gave some indication of the cost and value relationships among the aircraft. UPSCO used these rates as a basis for charging AF and WWF for air transport, and the amounts of these charges affected the prices charged to customers for delivery of packages and documents.
Plaintiffs may not rely on information withheld during the audit process, and not produced until shortly before or at trial, as a basis for challenging the Director’s weighting analysis. To allow and approve such conduct would encourage all taxpayers to withhold information during the audit process and then challenge the Director’s determinations in appeals using the very information withheld during the audit. This would prolong the audit process, increase its expense, and reduce the likelihood that the audit would produce an accurate analysis and determination of the taxpayer’s CBT obligations. When plaintiffs elected to withhold the cost and value information requested by the auditor, they placed themselves in a position to be subject to whatever reasonable determination the Director made based on the limited information they chose to provide.
*46 By intentionally withholding facts during the audit process, plaintiffs created a situation analogous to that contemplated by N.J.S.A. 54:4-34. Under this statute, a municipal tax assessor has the authority, for property tax assessment purposes, to request information relating to income-producing properties. If the taxpayer fails to respond to the request within the time period provided by the statute, the assessor is authorized to impose a reasonable assessment using the information available to her or him. The taxpayer’s right to appeal then is limited to the issue of whether the assessment was reasonable based on the information available to the assessor. Ocean Pines, Ltd. v. Borough of Point Pleasant, 112 N.J. 1, 547 A.2d 691 (1988). As described by our Supreme Court in Ocean Pines, the purpose of N.J.S.A. 54:4-34 is to assist in the efficiency of the assessing process by enabling the assessor to obtain information that is most likely to lead to the imposition of an accurate assessment. Id. at 7, 547 A.2d 691 (quoting from Terrace View Gardens v. Dover Twp., 5 N.J. Tax 469, 474-75 (Tax 1982)), aff'd o.b., 5 N.J. Tax 475 (App.Div.), certif. denied, 94 N.J. 559, 468 A.2d 205 (1983). In Yilmaz, Inc. v. Director, Division of Taxation, supra, 22 N.J. Tax 204, 235, the Tax Court held that the “logic” of the Supreme Court’s interpretation of N.J.S.A. 54:4-34 applied in the context of an appeal of sales and use tax assessments so that the Director was required only to use a reasonable methodology in imposing the assessments when the taxpayer failed to provide financial information to the Director as required by statute.
The significance of plaintiffs’ withholding of information during the audit process is not diminished by the decisions of the Tax Court in Middlesex Water Co. v. Director, Division of Taxation, 181 N.J.Super. 338, 3 N.J. Tax 233, 437 A.2d 368 (Tax 1981) and the Appellate Division in Chemical New Jersey Holdings, Inc. v. Director, Division of Taxation, 22 N.J.Tax 606 (App.Div.2004). Both decisions permit the assertion of alternative theories to support imposition of tax (Middlesex Water) or to defend against imposition of tax (Chemical New Jersey Holdings) when the new theories relate to the same facts as the initial theories. Neither decision holds that a party may change its theory of taxability or
*47 non-taxability based on previously undisclosed facts. In Middle-sex Water, Judge Lasser specifically noted that the alternative theory asserted by the Director “arises from the same set of facts that give rise to the additional assessment]..]” Id. at 254, 437 A.2d 368. In Chemical New Jersey Holdings, the court distinguished the facts before it from those considered in other decisions on the basis that “here, plaintiff has neither misstated nor omitted facts in its original filing. Nor does it rely on facts different or other than those stated on Form CBT-100.” Id. at 614.
UPSCO, AF, and WWF assert that their concerns as to the confidentiality of cost and value information justified their refusal to produce the information in the context of the audit. In making this assertion they ignore New Jersey’s statutory and regulatory requirements that tax information be kept confidential. Under N.J.S.A. 54:50-8(a), the records and files of the Director are “confidential and privileged” and may not be disclosed except for “a reason necessitated by the performance of official duties.” The Director has confirmed by regulation the confidentiality of information obtained in the audit process.
The returns are deemed secret and confidential and New Jersey law prohibits the unauthorized disclosure of information obtained from the returns or the records pertaining thereto.
[N.J.A.C. 18:7-11.141
Based on these statutory and regulatory provisions, I conclude that plaintiffs’ confidentiality concerns were groundless and did not excuse their refusal to provide the cost and value information requested by the Division of Taxation auditor.
For the preceding reasons, I hold that the Director’s determination to assess tax liability on AF and WWF, using the weighting analysis described above, was reasonable, and I sustain the assessments resulting from that analysis. The weighting analysis did not result in the assessment of additional tax on UPSCO.
E. Penalties (GS, Telecom, AF, and WWF)
The assessments that are the subjects of these appeals included interest, late payment penalties, and amnesty penalties. Plaintiffs contend that the penalties should not have been imposed, but have *48 not challenged their obligation to pay interest on taxes remaining due.
(1) Late Payment Penalties
The statutory basis for the imposition of late payment penalties is contained in N.J.S.A 54:10A-19.1(d), a provision of the CBT Act. This statute incorporates the provisions of the State Uniform Tax Procedure Law (known prior to 1983 as the State Tax Uniform Procedure Law), N.J.S.A 54:48-1 to N.J.S.A. 54:53-18. The specific provision in the Law that authorizes the imposition of penalties is N.J.S.A 54:49-6(a). Under N.J.S.A. 54:49-lla, the Director may “remit or waive the payment of the whole or any part of any penalty” if the taxpayer’s failure to pay tax when due “is explained to the satisfaction of the [D]irector[.]” The Director promulgated a regulation, N.J.A.C. 18:2-2.7, incorporating this waiver authority. Paragraph (a) of the regulation reiterates the statutory language authorizing the Director to abate or waive the payment of the whole or any part of any penalty if the taxpayer’s failure to pay tax when due “is explained to the satisfaction of the Director^]” Under paragraph (b) “[a]n abatement will be granted if the taxpayer can show reasonable cause for failure to file any return or pay any tax when due and makes full payment of the taxes due.” Paragraph (c) provides examples of reasonable cause, and paragraph (d)l provides in pertinent part as follows:
In addition to any relevant grounds for reasonable cause as exemplified in (c) above, circumstances that indicate reasonable cause and good faith with respect to the substantial understatement or omission of tax, where clearly established by or on behalf of the taxpayer, may include the following:
(i) an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge and education of the taxpayer ...
[N.J.AC. 18:2-2.7(d)l.]
Plaintiffs rely on paragraph (d)l as the basis for their contention that late payment penalties should be waived.
The Director’s exercise of her discretion to waive or abate penalties under N.J.S.A. 54:49-11a and N.J.A.C. 18:2-2.7(d)l, although entitled to deference, remains subject to court review.
*49 In reviewing an administrative action it is well settled that “courts are not free to substitute their judgment as to the wisdom of a particular administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable.” The statute under consideration delegates authority to the [Djirector to determine whether under particular circumstances penalty or interest should be remitted or waived. In fact, its terms grant the [D]ireetor considerable discretion. Under such circumstances, [the Director’s] actions should not be overturned unless they are manifestly corrupt, arbitrary or misleading.
[Media Graphics, Inc. v. Director, Div. of Taxation, 7 N.J. Tax 23, 33 (Tax 1984) (citations omitted), aff'd, 8 N.J. Tax 321 (App.Div.1986).]
In Media Graphics, the court determined that a statement by the Director in State Tax News was sufficiently misleading that the Director should not have imposed a late payment penalty when the taxpayer relied on the misleading statement.
Under circumstances where the Director made no misleading statement and the court found that the taxpayer’s accountant could not reasonably have relied on certain information as a basis for not making a payment of taxes, the Tax Court sustained the Director’s determination that a penalty should not be waived. Patel v. Director, Div. of Taxation, 13 N.J.Tax 509 (Tax 1993). See also Newman v. Director, Div. of Taxation, 14 N.J. Tax 313, 331 (Tax 1994) (concluding that the Director reasonably refused to waive penalties), aff'd, 15 N.J. Tax 228 (App.Div.1995). The most recent discussion of the standards to be applied by a court in reviewing the Director’s waiver or non-waiver of late payment penalties appears in Tozour Energy Systems, Inc. v. Director, Div. of Taxation, 23 N.J. Tax 341 (Tax 2007). There the Tax Court held as follows:
In the present case, the question is whether the Director abused his discretion in determining that plaintiff had failed to provide a satisfactory explanation for its failure to pay tax. As stated in Media Graphics ..., the court should not substitute its discretion for that of the Director, unless the Director’s determination is manifestly arbitrary or unreasonable.
[Id. at 360-61 (citation omitted).]
Plaintiffs argue that the conferee from the New Jersey Division of Taxation abated penalties in connection with his determination, discussed above, that interest should not have been imputed with respect to GS’s FAS 106 warehoused liabilities. Plaintiffs contend that a similar abatement or waiver is appropriate with respect to *50 the balance of GS’s tax liabilities and the tax liabilities of the other plaintiffs. In support of this argument, plaintiffs note that each Final Determination letter sent to them by the Director refers to N.J.A.C. 18:2-2.7(b) and indicates that, upon payment of the taxes due pursuant to each of the letters, an abatement of late payment penalties will be granted. Plaintiffs did not make payment of the respective amounts shown in the Final Determination letters, and the Director now refuses to abate or waive late payment penalties.
Based on the discussions above with respect to the various assessments under appeal, I conclude that the Director’s refusal to waive late payment penalties was manifestly unreasonable with respect to the taxes due based on interest imputed in connection with the UPS Group cash management system and in connection with the business services fee component of the loans to America reported by GS. As to each of these issues, genuine questions of fact and law existed concerning the propriety of the Director’s imputation of interest. The case law discussed above could be interpreted to suggest that the cash management system utilized by the UPS Group may not have generated loans, and no case law existed with respect to the tax treatment of the accrued but unpaid business services fee amounts.
I conclude that the Director acted reasonably in refusing to abate or waive late payment penalties with respect to the taxes due from GS resulting from the allocation of DPU revenue to New Jersey, and with respect to the taxes due from Telecom, AF, and WWF.
GS challenged the assessment against it relating to DPU charges on two bases. The first was that the charges were not wholly allocable to New Jersey, and the second was that, if any portion of the charges was allocable to New Jersey, a reeomputation of GS’s receipts factor would be required because of a double counting of revenue. As to the first argument, I have concluded that a portion of the charges, which GS concedes constituted revenue, was allocable to the GS facility in Kentucky. As to the balance of the charges, I concluded that all of the equipment used was located in New Jersey, all of the work and services were *51 performed in New Jersey, and, consequently, the receipts were allocable to New Jersey. With respect to the double counting argument, the CBT-100 returns filed by GS did not support its position.
The allocation of the non-Kentucky portions of the DPU revenue to New Jersey was not reasonably subject to dispute, and GS should have recognized the flaws in its double counting argument resulting from the calculations it included in its CBT-100 returns. Consequently, GS failed to establish, as to both of these aspects of the allocation issues, the existence of an “honest misunderstanding of fact or law that is reasonable in light of [its] experience, knowledge and education[.]” N.J.A.C. 18:2-2.7(d)l.
Telecom argued that it had no regular place of business in New Jersey. As discussed above, the applicable New Jersey statutes expressly do not require a regular place of business in New Jersey for one hundred percent allocation of receipts to New Jersey. All of Telecom’s activities were performed by GS employees at the GS facility located in Mahwah, New Jersey, and all of Telecom’s equipment was located at this facility. As a result, I find and conclude that no “honest misunderstanding of fact or law[,]” N.J.A.C. 18:2 — 2.7(d)l, reasonably could have existed with respect to Telecom’s failure to allocate its revenues to New Jersey.
UPSCO, AF, and WWF disputed the Director’s assessments on the basis that the Director was required to use New Jersey departures to total departures in order to allocate receipts to New Jersey in the absence of a showing by the Director that a weighting analysis as contemplated by N.J.A.C. 18:7-8.10(c)4i would have produced a more fair and reasonable allocation. These plaintiffs had no reasonable basis for withholding from the Director the information that the Director requested in order to make the weighting analysis. Consequently, the Director properly declined to waive late payment penalties as to AF and WWF.
(2) Amnesty Penalties
In addition to challenging the Director’s imposition of late payment penalties, plaintiffs also contest the Director’s imposition *52 of a five percent amnesty penalty pursuant to the provisions of N.J.S.A. 54:53-17 and -18. Each of these statutes provided for the establishment of an amnesty period
during which a taxpayer who has failed to pay any State tax on or before the day on which the tax is required to be paid may pay to the [D]irector on or before the last day of the period established by the [Director the amount of that tax, without any interest that may otherwise be due, without any costs of collection that may otherwise be due, and without the imposition of any civil or criminal penalties arising out of an obligation imposed under any State tax law.
[N.J.SA. 54:53-17a; N.J.SA 54:53-18a.]
The amnesty period under N.J.S.A 54:53-17 applied only to tax liabilities relating to returns due between January 1, 1987 and December 31,1995. The amnesty period under N.J.S.A 54:53-18 applied only to tax liabilities relating to returns due between January 1,1996 and December 31, 2001. CBT returns are due on the fifteenth day of the fourth month following the close of the taxpayer’s privilege period (tax year). N.J.S.A. 54:10A-15(c). Plaintiffs’ tax years were calendar years, and their respective CBT returns were due on April 15 following the end of each calendar year. Therefore, as to the years in issue in these appeals, the amnesty period under N.J.SA 54:53-17 applied to taxes due for the years 1991 through 1994 and the amnesty period under N.J.SA. 54:53-18 applied to taxes due for the years 1995 through 1999.
Paragraph b of both N.J.SA. 54:53-17 and -18 provided as follows:
There shall be imposed a 5% penalty, which shall not be subject to waiver or abatement, in addition to all other penalties, interest, or costs of collection otherwise authorized by law, upon any State tax liabilities eligible to be satisfied during the period established pursuant to subsection a. of this section that are not satisfied during the amnesty period.
[N.J.S.A. 54:53-17b; N.J.SA 54:53-18b.]
Although these statutory provisions expressly precluded waiver or abatement of the amnesty penalty, plaintiffs contend that they are not subject to the penalty under either statute based on the legislative history of the statutes. Specifically, plaintiffs rely on the following portion of the Assembly Appropriations Committee Statement to the Assembly Bill that included the provisions enacted as N.J.S.A 54:53-17:
*53 The State Treasurer testified, and it is the understanding of the committee that ____ the bill’s [amnesty] penalties will not be applied to deficiencies assessed pursuant to a question of law or fact uncovered through routine audits of taxpayers otherwise in compliance with the filing and payment requirements of State taxes. [Assembly Appropriations Committee Statement to Assembly Committee Substitute for A. 1420 (February 5,1996).]
Similar language appeared in the Senate Budget and Appropriations Committee Statement to the Senate version of A. 1420. Senate Budget and Appropriations Committee Statement to Senate Committee Substitute for & 675 (February 15,1996). No such language, however, was included in the committee statements to the bills enacted as N.J.S.A. 54:53-18. Senate Budget and Appropriations Committee Statement to Senate Committee Substitute for S. 16 and 404 (February 21, 2002); Assembly Appropriations Committee Statement to A. 2001 (March 4, 2002).
The Director does not dispute (i) that plaintiffs filed timely returns and paid the taxes reported as due in those returns, and (ii) that the bases for the assessments which are the subject of plaintiffs’ appeals were discovered as a result of audits of plaintiffs’ tax returns. Consequently, based on the Committee Statements with respect to N.J.S.A. 54:53-17, the taxes due from plaintiffs for tax years 1991 through 1994 are not subject to the amnesty penalty imposed by paragraph b of this statute. Because the legislative history with respect to N.J.S.A. 54:53-18 lacks a statement similar to that quoted above with respect to N.J.S.A. 54:53-17, the amnesty penalty imposed by N.J.S.A. 54:53-18b could be applicable to plaintiffs’ tax obligations for the years 1995 through 1999. I conclude, however, that, because the language of N.J.S.A. 54:53-17b and -18b is identical, the two statutes should be interpreted to have the same meaning and applicability.
In addition to their reliance on legislative history, plaintiffs assert that they are not liable for the penalties imposed by N.J.S.A. 54:53-17b and -18b because the Director issued her Notices of Assessment to them during April 2003, and the amnesty periods under N.J.S.A. 54:53-17a and N.J.S.A. 54:53-18a expired on February 28, 1997, and on June 20, 2002, respectively. Plaintiffs contend that, as a result of the issuance of the Notices of Assessment after the expiration of the amnesty periods, any *54 additional taxes that plaintiffs may owe do not constitute “tax liabilities eligible to be satisfied” during the amnesty periods as contemplated by N.J.S.A. 54:53-17b and -18b.
I construe the phrase “tax liabilities eligible to be satisfied” as used in N.J.S.A. 54:53-17b and -18b to refer to liabilities which, during the applicable amnesty period, were known to the taxpayer or which, by reasonable inquiry, could have been known. The purpose of the amnesty program, and the penalty provisions, was to accelerate payment of taxes. If, during an amnesty period, a taxpayer, in good faith, did not know and, by reasonable inquiry, could not have known that additional taxes were due, or that the Director claimed additional taxes were due, then those taxes were not “eligible to be satisfied” during the amnesty period.
I conclude, therefore, that plaintiffs are not subject to amnesty penalties with respect to the taxes I have determined to be due. The penalty imposed by N.J.S.A. 54:53-17b does not apply because the legislative history of this statute indicates a legislative intent that the penalty not be imposed under the factual circumstances before me. That legislative history suggests that the same interpretation is applicable to the identically worded provisions of N.J.S.A. 54:53-18b. The penalties imposed by both N.J.S.A. 54:53-17b and -18b do not apply because plaintiffs were not notified of the Director’s assessments of additional taxes until many months after expiration of the applicable amnesty periods. Before issuance of the notices, plaintiffs did not know of the existence or amounts of the various assessments. Possibly, the assessment information was available shortly before the notices were issued, but inquiries during the amnesty periods would not have resulted in disclosure of the information.
The preceding rulings do not, and should not be construed to, preclude the imposition of amnesty penalties in all circumstances where the Director’s Notice of Assessment is not issued until after expiration of an amnesty period. Here, the Director made no showing that any of the plaintiffs intentionally understated their tax obligations on their CBT-100 returns or otherwise filed the returns in bad faith. If a taxpayer is shown to have intentionally *55 understated its tax liability on its CBT return, or otherwise to have acted in bad faith in filing the return, an amnesty penalty might be applicable even if the Notice of Assessment issues after the statutory amnesty period expires. I need not, and do not, decide this issue.
VI.
Summary
The following is a summary of my rulings in this opinion.
a) The Director properly imputed interest on the portions of the amounts reported by GS, Telecom, AF, and WWF as loans to America that related to the UPS Group cash management system.
b) The Director properly imputed interest on the portions of the amounts reported by GS as loans to America that represented accrued but unpaid business services fees.
c) The Director improperly imputed interest on the portions of the amounts reported by GS as loans to America and identified by plaintiffs’ accounting expert as liabilities warehoused by GS for other members of the UPS Group.
d) The Director correctly calculated the non-deductible portion of interest imputed on loans from America to UPSCO.
e) All of GS’s DPU revenue not allocable to its Kentucky facility was allocable to New Jersey.
f) All of Telecom’s revenue was allocable to New Jersey.
g) The Director properly used a weighting analysis to determine the revenue of UPSCO, AF, and WWF allocable to New Jersey.
h) Late payment penalties may not be imposed with respect to taxes due as a result of rulings (a) and (b) above, but may be imposed with respect to all other taxes due as a result of rulings (e) through (g).
i) Amnesty penalties may not be imposed as to any taxes due pursuant to the foregoing rulings.
The Director shall prepare a form of Final Judgment for each appeal, setting forth the applicable rulings contained in this opinion and, pursuant to R. 8:9-3, quantifying the taxes, interest (with per diem amounts), and penalties due as a result of each ruling. The taxes due shall be determined based on the findings contained in this opinion and, to the extent necessary, based on documents in evidence or otherwise available to the Director. Each Judgment should be submitted to the Court pursuant to R. 4:42-l(c). In the event the parties are unable to agree on the monetary amounts *56 included in any Judgment, a hearing will be scheduled, pursuant to R. 8:9-4, to resolve the items in dispute.

 The term generally used for the division of income between or among states is “apportionment.” The New Jersey statute uses the term “allocation,” and I will follow the New Jersey statutory terminology in this opinion.

 In double entry accounting, debits and credits must be equal. Carl S. Warren et al., Financial & Managerial Accounting 53 (8th ed.2005). A debit entry increases asset accounts on the corporate balance sheet and decreases liability accounts and stockholders' equity and retained earnings. A credit entry decreases asset accounts and increases liability accounts and stockholders' equity and retained earnings. Id. at 52.

 Plaintiffs' witnesses referred to this account as "Accounts Receivable," “Accounts Receivable-Due From Parent," and "Due From Parent."

 Although GS contended that the amounts reported by it in Line 24 of Schedule B did not include cash sweeps, its accounting expert testified to the contrary as will be discussed below. Although cash received by UPSCO was subject to the cash management system sweeps, this corporation reported loans from America in Line 24 of Schedule B. The imputation of interest issue as to UPSCO, therefore, is different from that raised by GS, Telecom, AF, and WWF and will be discussed in subsection (3) below.

 Each of the year end amounts shown above was the beginning of year amount for the following year. The beginning of the year amount for 1991 was $351,829,197.

 The expert's assertion that no loans occurred because no funds were transferred from GS to America implies that the UPS Group cash management system discussed above, where funds were transferred from GS and the other plaintiffs to America, constituted a system of loans.

 In fact, the Due From Parent account was treated internally, and on GS’s CBT-100 returns, as a liability with a negative balance. This negative liability translates into an asset, and I have treated it as such.

 Subparagraphs (a)l and (a)2 of the regulation, which essentially reiterate the provisions of N.J.S.A. 54:10A-10(a) and (b) (quoted above), also support the imputation of interest.

 I am unable to reconcile the total of these New Jersey and Kentucky amounts with the amounts shown on the analyses by the New Jersey Division of Taxation auditor. The Director did not produce the records on which the auditor based her analysis. Consequently, I will accept and rely on GS's records.

 GS has distinguished between "payroll” and "payroll paid." The distinction is of no significance for purposes of this discussion.

 Beginning in 1994, Part III of Schedule J replaced Schedule K in the CBT-100 return.

 The quoted language was deleted from N.J.S.A. 54:1 OA-6 by L. 2008, c. 120, § 2. Because the deletion was not in effect for the years in issue, it has no impact on my analysis.

 See footnote 13.