NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS
TAX COURT OF NEW JERSEY



**Mala Sundar**
 **JUDGE**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625
Telephone (609) 815-2922
TeleFax:  (609) 376-3018
taxcourttrenton2@judiciary.state.nj.us

September 5, 2018

Richard C. Kariss, Esq.
Zachary T. Gladney. Esq.
Steven L. Penaro, Esq.
Alston & Bird, L.L.P.
90 Park Avenue
New York, New York 10016

Michael J. Duffy
Deputy Attorney General
RJ Hughes Justice Complex, P.O. Box 106
25 Market Street
Trenton, New Jersey 08625

> Re:   Xpedite Systems, Inc. v. Director, Division of Taxation
>       Dkt. No. 018847-2010

Dear Counsel:

This is the court's opinion as to the parties' second round of summary judgment motions. The issue is how much of plaintiff's income from fax blast services should be allocated to New Jersey. After an audit, defendant ("Taxation") determined that a 76% allocation is appropriate under a "25-50-25" methodology prescribed in N.J.A.C. 18:7-8.10(c) (25% of receipts allocated to the State in which costs originate; 50% of receipts allocated to the State in which the service is performed; and 25% of the receipts allocated to the State in which the transaction terminates). Taxation accordingly assessed plaintiff with Corporation Business Tax ("CBT"), plus interest and penalties, of $6,160,750 for fiscal years 1998-2000, and 2002.

*

Plaintiff ("Xpedite") had initially moved for summary judgement claiming N.J.A.C. 18:7-18(c) was inapplicable, and the controlling regulation was N.J.A.C. 18:7-8.10(a) pursuant to the ruling in  United Parcel Serv. Gen. Serv. Co. v. Dir., Div. of Taxation, 25 N.J. Tax 1 (Tax 2009), aff'd, 430 N.J. Super. 1 (App. Div. 2013), aff'd, 220 N.J. 90 (2014), specifically, Example 2 therein ("Example 2"), therefore, the assessments were void as a matter of law.[1]  N.J.A.C. 18:7-8.10(a) explains how the numerator portion of the receipts fraction (for purposes of computing the allocation percentage to New Jersey) is to be calculated, and states that where services are performed inside and outside New Jersey, the receipts are determined "based upon the cost of performance or amount of time spent in the performance of such services or by some other reasonable method that should reflect the trade or business practice and economic realities underlying the generation of the compensation for services."  Example 2 states that where a taxpayer earns income from the "sale of long distance telephone communications service," it should allocate its "long distance toll revenues attributable to services performed in New Jersey . . . based upon billings for calls originating in New Jersey."  Ibid.

Taxation cross-moved for summary judgment contending that its assessments are presumptively correct, and that Xpedite's receipts would be allocatable 100% to New Jersey even under N.J.A.C. 18:7-8.10 (a) and United Parcel.

The court denied both motions holding that Taxation's assessments are presumptively correct and cannot be voided, unless it is proven to be aberrant and unreasonable.  Since it was undisputed that Xpedite had in-State and out-of-State customers, and facts were needed to decide

---

[1]  In United Parcel, the court had applied the pre-1997 version of N.J.A.C. 18:7-8.10(a) which provided that "[r]eceipts from services performed within New Jersey are allocable to New Jersey." Pre-1997 amendment, there was no 25-50-25 formula in N.J.A.C. 18:7-8.10(c), and Example 2 was contained in this subsection.

the percentage of allocation of Xpedite's sales receipts properly allocable to New Jersey, which facts were yet to be developed, the court denied summary judgment to both parties.

These instant second round of summary judgments then followed. Both parties claimed discovery is complete, no further facts are needed, and per Taxation, no more facts can be elicited since Xpedite claims that it has no employees with knowledge relevant to the issues herein for the tax years involved. Xpedite argues that its income should be allocated to New Jersey under Example 2, and its filings with the Securities and Exchange Commission ("SEC"), along with its parent's such filings, proves that it competes with common carriers such as AT&T or MCI, therefore, it is providing long distance ("LD") telephone communications services illustrated in Example 2. Taxation disagrees on grounds Xpedite is not a LD telephone company such as AT&T, and thus, is not a provider of LD telephone calls/services, which earns income from LD telephone calls. Without credible non-hearsay proof to the contrary, Taxation argues, its presumptively correct assessments must stand.

For the reasons following, the court affirms the assessments. Taxation's audit determined that Xpedite's allocation based on its costs-of-performance inadequately represented the receipts allocable to New Jersey. Xpedite provides nothing to contradict this basis for the CBT assessments. Rather, it offers an alternate methodology, namely Example 2. An example cannot trump a statute or regulation. Further, the language and intent of Example 2 shows that it is limited to regulated LD carriers, thus would not apply to Xpedite. Even if Example 2 is deemed to be ambiguous as to its intendment and reach, it will not apply to Xpedite because the clear intent of the controlling statutes and implementing regulation is an inclusion of all receipts, pursuant to which, and based on the facts presented to the court, would require 100% of Xpedite's receipts as allocable to New Jersey.

3

**FACTS**

In May 2007, Taxation completed an audit of Xpedite for tax years 1998 through 2005, for CBT, and for Sales & Use tax ("SUT"). The auditor examined records and had discussions with Xpedite's accountants (PricewaterhouseCoopers, LLP, "PwC"), and Xpedite's employees, Jeffrey Carter (Manager, Sales Tax Billing) and Gary Schwerdt (Manager, Network Cost & Routing).

Based on such information, the auditor described Xpedite as a telecommunications retailer which used carrier signals to send information on behalf of its customers, "much like a freight company uses a toll road," thus was not a "telecom provider," which originated carrier signals (the dial tone). Xpedite's business was providing "mass messaging services via fax, e-mail and voice," with the mass faxing being the source of the "vast majority of sales." Its New Jersey headquarters was the "hub for the application of the software and the location for most of the hardware," and was also "the origination and/or destination point of all telecommunication services." All transmissions originate in New Jersey, and then are transmitted, using telephone lines, via the least cost route, which is determined by Xpedite's software after the destination is entered into the software program. The transmission is sent to a remote fax delivery controller ("RFDC"), which is located in or out of State, and connects to another telephone line, in or out of State. If the first choice of the route has a long queue, the broadcast would be routed to the next best least cost route. Interstate and intrastate broadcasts are done from an out-of-state located RFDC since interstate rates are lower. The auditor also noted that the out-of-State locations were "mainly sales offices," and about 50% of Xpedite's payroll were New Jersey employees.

In examining the allocation of receipts, the auditor found that Xpedite apportioned sales based on payroll, with most of the out-of-State wages for sales persons, but then, as to New Jersey sales, Xpedite reallocated them to other States and about $75 million to a category "other." He

4

noted that if the sales were to be allocated based on Xpedite's cost of performance (i.e. wages), then it would result in about $58 million "of NJ sales and not the $4,786,072 as reported" on the CBT returns. He thus deemed Xpedite's apportionment of its sales receipts to New Jersey as unrealistic since its cost-of-performance computation did not "accurately reflect New Jersey receipts," or "the trade, business practice and economic realities underlying the generation of charges for the services," or Xpedite's "business activities" in New Jersey. As permitted by N.J.S.A. 54:10A-8, and -10, he rejected Xpedite's receipts allocation method.

His discussions with Mr. Carter and Mr. Schwerdt revealed that New Jersey was the origination point of all transmissions; 60% of the switching devices were located in New Jersey; the switching devices located outside New Jersey are nonetheless "directed by" New Jersey; and transmissions destined for New Jersey are routed through equipment located out-of-State. He therefore concluded that 98%-100% of Xpedite's sales receipts are allocable to New Jersey because, (1) Xpedite had significant property in New Jersey used in performance of the services; (2) New Jersey was the origination of all transmissions, i.e. sent out from New Jersey "via telephone lines;" and, (3) the "hardware and software that determines the least cost route, directs, controls and originates the transmissions," are in New Jersey. If, however, the out-of-State location of the switching devices were considered, then 89.8% would be allocable to New Jersey.

However, pursuant to a meeting between PwC and Taxation's upper management, the auditor was directed to allocate receipts based on the 25-50-25 formula contained in N.J.A.C. 18:7-8.10(c). This resulted in 76.36% of Xpedite's sales receipts being allocated to New Jersey (25% of receipts allocated to State of origination which was New Jersey, plus 50% of receipts allocated to the State where the service is performed, which was also New Jersey, plus 1.306% of the 25% of receipts allocated to the State of termination, i.e. to New Jersey). The consequent CBT

5

assessment was \$495,288 (1998); \$848,170 (1999); \$1,006,898 (2000); and \$35,176 (2002), totaling \$4,923,285 inclusive of interest and penalty.[2]

Xpedite protested the audit's CBT assessment contending that N.J.A.C. 18:7-8.10 did not apply to it, except maybe Example 2 of subsection (a) because that was "similar to [its] business model." Taxation's conferee rejected Xpedite's reported allocation (i.e. 5%-7%) as not reflective of the underlying economic reality. She found that since most faxes originate in this State, where all the services are performed, and the equipment is located, the allocation should be 100% under N.J.A.C. 18:7-8.10(a), and United Parcel. She upheld the auditor's allocation.

In the instant motions, neither party disputes the factual assertions in the audit and conference reports. Xpedite disagrees with Taxation's conclusions, and provided its 1995 IPO (initial public offering) filing, 1996 annual filing with the SEC, as well as the SEC filings of its parent Premier Technologies, Inc. ("PTI") (for 1998), and of PTEK Holdings, Inc. (for 1999-2002), as evidence of its business model. Taxation claims that the SEC filings were un-authenticated and inadmissible hearsay. Taxation provided the deposition testimony transcript of Mr. Schwerdt, as evidence of Xpedite's business.[3] Xpedite claimed that Mr. Schwerdt was merely

---

[2] As to SUT, the auditor found that the amounts reported on Xpedite's SUT returns as compared to the CBT returns differed "by several million dollars" because Xpedite only reported what it deemed to be New Jersey taxable sales, which was determined using a "2 out of 3 rule," i.e., if two of the following three conditions were met, it made the sale taxable: (1) origination of a call (default is New Jersey); (2) customer's billing address; and (3) call destination. If (1) and (3) were in New Jersey, it was a taxable sale; if (2) and (3) were "same," tax was collected based on the rate of the "destination State;" if (1) and (2) were the "same," all sales were taxable at for New Jersey customers at the New Jersey sales tax rate. The auditor essentially accepted this methodology and imposed \$39,040 as SUT for sales which either were untaxed, or taxed by other States at a lower rate. Xpedite did not contest this assessment.

[3] In response to Taxation's subpoena, Xpedite claimed it could not locate Mr. Schwerdt. Taxation then independently located the individual and procured his deposition.

6

a financial analyst, thus was not qualified as an expert, and lacked knowledge, as to the nature of Xpedite's business, which rendered his deposition testimony unreliable because it is lay opinion.

The court rejects both these positions. The SEC filings are publicly available documents, and need not be rejected due to lack of formal authentication. See N.J.R.E. 201 (facts which may be judicially noticed include "specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources whose accuracy cannot reasonably be questioned."); Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) ("'[T]he documents are required by law to be filed with the SEC, and no serious questions as to their authenticity can exist," especially if they are used to "determine what the documents stated.'") (quoting Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)[4]); In re Rockefeller Ctr. Properties Sec. Litig., 184 F.3d 280, 293 (3d Cir. 1999) (court is authorized "to take judicial notice of all public disclosure documents which are either required to be filed with the SEC or are actually filed with the SEC.") (Nygaard, J, concurring in part and dissenting in part).[5] Additionally, R. 1:6-6 does not apply since the documents produced in support of its summary judgment motion were discovery materials. While it is true that the management's statements in the SEC filings are being offered for the truth of the matter, viz. as evidence as to the nature of Xpedite's business, the essence of the descriptions in those documents are almost identical to the representations made by Xpedite to Taxation during audit, and in the course of this litigation, and recited in the audit and conference report, both of which documents are undisputed. Similarly, Mr. Schwerdt's deposition testimony as to Xpedite's

---

[4] The ruling applied only "to public disclosure documents required by law to be filed, and actually filed, with the SEC, and not to other forms of disclosure such as press releases or announcements at shareholder meetings." Kramer, 937 F.2d at 774.

[5] In that case, the counsel for the party submitted an affidavit authenticating copies of the annual reports filed with the SEC. In re Rockefeller Ctr. Properties Sec. Litig., 184 F.3d at 293.

business operations largely conforms to Xpedite's management's statements in the SEC filings. That he does not consider Xpedite as a LD telephone provider is not germane, because the court is not using his views in this regard to decide the matter.

Based on these documents, as well as the undisputed material facts recited by each party, the court finds the following facts as to Xpedite's business. Xpedite is a Delaware-incorporated entity and headquartered in New Jersey. Its stock is publicly traded. Its Data Center, a large operations center, is in Tinton Falls, and it also uses a facility in Piscataway as an operations or backup center. It was acquired in February 1998 by PTI, a Georgia-based company, which changed its name to PTEK Holdings, Inc.

Xpedite delivers business advertisements/messages/information on behalf of its customers who/which are predominantly financial service companies and travel agencies. It provides basic and enhanced fax services. A customer sends the information to Xpedite, with a list of fax addresses, which Xpedite then blasts to multiple recipients. The customer can electronically send its order to Xpedite from the customer's location, using either the customer's fax machine or computer, using local or long distance phone company lines that it subscribes to. It can also upload the desired list of targets with the targets' fax numbers on Xpedite's webpage (after logging in as Xpedite's customer). Xpedite's system would either store and then forward the fax, or would connect the customer's fax to the recipient's fax, for immediate delivery. A customer could also send a message from its computer, which will be routed through Xpedite to the recipient.

All orders are received in New Jersey, at Tinton Falls. Xpedite then ensures its delivery electronically, through the quickest and cheapest means, from the Tinton Falls Data Center. After a fax blast, Xpedite's computer systems track the transmission and delivery to ensure delivery was complete. Thus, what would normally take hours for a customer in sending multiple faxes, can be

8

done within minutes by Xpedite, and saves customers time and money, with the added benefit of knowing that the document was delivered.

Xpedite charges its customers based on per domestic minute or per page for a broadcast fax, or based on file size, or per domestic minute for voicemail. Separate rates are charged for international transmissions. Xpedite's revenues are thus from broadcast deliveries, and based on time (per-minute) of LD service usage, and upon volume for e-mail distributions. The contract also showed an additional "minimum commitment" fee or charge, and services such as "fax response, FOD, VR Hokey Transfer, BANNERfx, etc." was at a certain dollar amount not based on per-minute or per-page. Xpedite negotiates "lower rates with its primary telecommunications service providers," to increase its profit margins, and uses "least cost routing to reduce its telecommunications costs, including direct interconnections with local exchange carriers," which allows Xpedite to provide its high-volume customers discounts or better pricing.

Xpedite performs its services using computers, software, servers, routers, switches, third party communication equipment and switching centers, and leased telecommunication lines connecting these systems using nodes (equipment which allows access to or egress via a local telephone call, a.k.a. a point-of-presence or POP). The nodes allow for faxes to be sent and terminated using inexpensive local calls, instead of more expensive LD or international calls as the leased telecommunications lines "provide the reliable, continuous, high-speed throughout required for delivery" of the immediate or "real time" faxes. Outbound faxes are delivered through the POPs for transmission by an LD carrier.

A sketch (provided by Xpedite to Taxation during the audit) depicted Xpedite's business as follows:



So that the transmissions are not interrupted (due to power outages or other issues), Xpedite uses a variety of carriers to transmit its telecommunication traffic, and uses a variety of telecommunications routing technology, including using a fiber-optic connection with Bell Atlantic, which allows immediate re-routing of traffic. Thus, in a power outage affecting a "terminating carrier," Xpedite would switch the calls to another terminating carrier.

Xpedite does not own any of the telephonic cable or electronic transmission lines. Rather, it uses third-party communications and network equipment such as telephone lines, servers, routers, and third party switching centers, which are located throughout the country, to transmit

the fax-blasts or e-mail blasts.  Neither Xpedite (nor PTI or PTEK) own a transmission network, and therefore, depend on common carriers such as MCI, AT&T, and other "facilities-based carriers" for transmitting the LD calls, and depend upon Local Exchange Carriers ("LECs") or Competitive LECs ("CLECs") for "call origination and termination."[6]  The telecommunications lines are leased from a several major "telecommunications carriers" on a short term or multi-year basis pursuant to supply agreements, sometimes "with an option to upgrade to higher speed lines, and generally billed on a monthly basis."  Such leased "capacity" on a common carrier's "backbone" enabled Xpedite and its sister companies to provide connectivity and data transmission within its "private data network," and its "hub equipment is co-located at various MCI WorldCom sites."  PTEK also relied "primarily upon leased network facilities of other telephone companies," did not "own a transmission network," and depended on LECs and CLECs "for call origination and termination."[7]

All the SEC filings cautioned that the business' success depended not only upon obtaining telecommunication services on favorable terms from LD carriers for the transmission of the customers LD calls, but also upon the "cooperation of both interexchange and LECs or CLECs in originating and terminating service" for the customers "in a timely manner."  Loss of the "ability

---

[6] LECs are "local telephone companies that provide traditional land-line phone service," and "typically serve a small local service area covering a few local 'exchanges,' which are designated by the first three numbers of a seven-digit phone number."  Sw. Bell Tel. Co. v. V247 Telecom L.L.C., 207 F. Supp. 3d 688, 690-91 (N.D. Tex. 2016).  The Telecommunications Act of 1996 created CLECs by "open[ing] the market to competition, allowing different carriers to serve the same exchange area."  Ibid.  The prior monopolies are the Incumbent Local Exchange Carriers ("ILECs").

[7] The SEC filings also stated that the company or sister companies, including Xpedite, purchase LD services from MCI, Cable & Wireless Communications, Inc., Worldcom, and other "national post, telephone and telegraph" ("PTT") companies, "to carry fax traffic that is routed to destinations where" Xpedite did not have nodes.

to receive or terminate calls would" produce a significant revenue loss to Xpedite's corporate family. Similarly, the ability "to maintain network connectivity" depended on "access to transmission facilities provided MCI WorldCom or an alternative provider," and thus, inability to continue the agreement with MCI, including the co-location, could lead to revenue loss.

The SEC documents claim that AT&T, MCI WorldCom, Sprint, and other PTT companies are competitors because they provide certain enhanced fax communication services. They also describe only Premiere Communications, Inc. ("PCI"), one of the subsidiaries, as being a LD telecommunications/operator services, regulated by the Federal Communications Commission ("FCC"). PCI was initially reported as having either "applied for and received . . . all necessary certificates or authorizations to provide intrastate, [LD] services," subject to the State public utility commission control. In later years' SEC filings, it was reported as being authorized to provide such service in 46 states.

Mr. Schwerdt, who analyzed rates charged by various "telecom companies," stated that Xpedite was a

> broadcast and transactional fax delivery company for documents . . . . [M]y dealings was trying to keep the costs under control, the lowest – again, referring to the least-cost routing system which is in existence since what I've more or less managed. In other words . . . the business model is such where we obtain rates from larger – predominantly the large carriers, and rates vary across those carriers, and my job was to find the least-cost route for a particular dialed number to determine . . . where we wanted to use that carrier in our system.

If a customer needed immediate fax delivery, and since Xpedite had only "so much capacity at various locations across the nation," the fax would "go into a queue, and if that queue is filled up and it's taking too long, it would need to be jumped to a different carrier or a different route" through POPs or nodes (typically owned by the LD carrier), so that the fax is delivered

12

immediately. This could be costly due to higher rates attributable to dealings with various carriers, including local carriers, however, Xpedite "predominantly dealt with" LD carriers, or regional carriers (if cheaper). The "last mile" of the message's delivery path (i.e. closest to the fax's destination) was "always [a] local carrier." Xpedite rented connections from such carriers, and was billed per minute. Thus, its costs were the billed minutes plus the cost of leasing the lines from a carrier such as Bell Atlantic or any other out-of-country carrier, plus equipment such as computer servers.[8]

**ANALYSIS**

Summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court finds that summary judgment is an appropriate mechanism because the material facts are undisputed as are the documents in support of each party's summary judgment motion. Although parties may draw different conclusions from the undisputed facts and documents, the court is not bound by the differing interpretations as a reason to deny summary judgment.

The CBT is imposed on the income allocable to (i.e. sourced to) New Jersey. N.J.S.A. 54:10A-6.[9] The allocation is achieved by dividing the "New Jersey property, receipts, and payroll,

---

[8] In his deposition, Mr. Schwerdt claimed not to have recollected speaking with the auditor or anyone from Taxation during the audit. However, the auditor's report contained almost an identical description of Xpedite's business based on information from Mr. Schwerdt. See supra p.4.

[9] A corporation's income was 100% allocable to New Jersey if it did not maintain a "regular place of business" outside New Jersey. This provision was abrogated in 2008. L. 2008, c. 120 §2.

respectively," with the entity's "total (real and tangible) property, business receipts, and payroll, respectively," as averaged. Stryker v. Dir., Div. of Taxation, 168 N.J. 138, 148 (2011). The "combined fraction is then applied to the" entity's entire net income, so that the "the percentage or portion of" the income is "properly attributable, and thus taxable, to New Jersey." Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 323 (1984). Taxation has the "broad authority to adjust the allocation factor in order to reflect more accurately and fairly the activity, business, receipts . . . or entire net income of a taxpayer reasonably referable to the state." Ibid.

The receipts portion of the numerator is to include receipts from, among others, "services performed within the state." N.J.S.A. 54:10A-6(B)(4). For the tax periods at issue here, the interpretive regulation provided as follows:

> The numerator of the receipts fraction developed in accordance with this section includes receipts from services not otherwise apportioned under this section. If the service is performed both within and outside this State, the numerator of the receipts fraction includes receipts from services based upon the cost of performance or amount of time spent in the performance of such services or by some other reasonable method which should reflect the trade or business practice and economic realities underlying the generation of the compensation for services. "Cost of performance" is defined as all direct costs incurred in the performance of the service, including direct costs of subcontractors.
>
> [N.J.A.C. 18:7-8.10(a).]

For instance,

> Taxpayer earns income from the sale of [LD] telephone communications service. It bills the originators of [LD] telephone calls directly and for all calls placed by them. The appropriate method of allocating its [LD] toll revenues attributable to services performed in New Jersey is based upon billings for calls originating in New Jersey.
>
> [N.J.A.C. 18:7-8.10(a), Example 2.]

Prior to 1997, Example 2 used to be contained in subsection (c) of N.J.A.C. 18:7-8.10. It was inserted in 1984 in connection with regulatory amendments due to the ruling in Metromedia, Inc. which had voided a CBT allocation based on an audience share on grounds that Taxation's determination was invalid rule-making. See 16 N.J.R. 3420(b) (Dec. 17, 1984). Taxation explained that in "adding a rule regarding the radio and television industry, . . . [it] also decided to add additional rules that dealt with services performed partially within this State and partially outside this State," for purposes of N.J.S.A. 54:10A-6(B)(4) (the numerator portion of the allocation factor). 16 N.J.R. 3420(b). In this process of "putting into rule form [Taxation's] policies and practices," it added "examples to better explain" those policies, such as the LD telephone example. Ibid.[10]

In 1997, Taxation "updated and restructured" N.J.A.C. 18:7-8.10 "to show more clearly [Taxation's] emphasis on the cost of performance for sourcing purposes for receipts from services." See 29 N.J.R. 3426(a) (Aug. 4, 1997). They also explain "the use of the locations of the origination and termination in these transactions," and "describe[] a formula for the proper treatment of receipts as the result of use of certain machines through credit cards and internet access where the taxpayer otherwise has nexus with New Jersey." Ibid. Subsection (a) was amended, and the substantive portion of the then-existing subsection (c), as well as Example 2,

---

[10] The pre-1997 version of subsection (c) addressed the allocation of "a lump sum is received by the taxpayer in payment for services within and without New Jersey." N.J.A.C. 18:7-8.10(c) (pre-1997). As to such payment, "the amount attributable to services performed within New Jersey is to be determined on the basis of the relative values of, or amounts of time spent in the performance of those services within and without New Jersey, or by some other reasonable method which should reflect the trade or business practice and economic realities underlying the generation of the compensation for services." Ibid. Example 1 illustrated allocation of receipts from advertising "in the course of broadcasting television or radio services." Example 2, as noted above, illustrated allocation of LD telephone toll revenues. Ibid.

15

were moved to subsection (a). <u>See</u> 29 N.J.R. 4324(a) (Oct. 6, 1997). The prior subsection (c) was replaced by the 25-50-25 allocation formula as follows:

> (c) Certain service fees from transactions having contact with this State are allocable to New Jersey based upon the following:
>
> 1. Twenty-five percent of such fees are allocated to the state of origination.
> 2. Fifty percent of such fees are allocated to the state in which the service is performed.
> 3. Twenty-five percent of such fees are allocable to the state in which the transaction terminates.
>
> [N.J.A.C. 18:7-8.10(c).]

For instance, if an entity provides "on-line internet access," with equipment for such purposes "located outside" the State, to customers within and without the State, then it must allocate 50% of "revenue from internet access charges to New Jersey based upon the origination and termination of such access from points within New Jersey." N.J.A.C. 18:7-8.10(c), Example 2. If the "points of origination and termination," cannot be specifically identified, then, "the customer's billing address will serve to locate these activities." <u>Ibid.</u> <u>See also</u> <u>United Parcel</u>, 25 N.J. Tax at 37 (Example 2 means that due to the "essential" equipment's location "outside this State, transactions occurring in New Jersey, but using equipment located outside this State, have only "'contact' with New Jersey" therefore, there is a "percentage allocation of revenue . . . .").

Initially, it is important to note that an example does not, in and of itself, control, expand or limit the general intent and scope of either the implanting statute or its interpretive regulation. <u>See</u> <u>Praxair Tech., Inc. v. Dir., Div. of Taxation</u>, 201 N.J. 126, 139-40 (2009) (rejecting the taxpayer's argument that until the regulation provided an example, taxpayer's "business arrangement with its corporate parent became" taxable, and that "tax liability somehow can flow from a regulatory change," and holding that although Taxation's regulatory powers are

16

"circumscribed by the taxing authority in fact conferred by the Legislature," nonetheless, "the legislative intent behind the [CBT] Act is for [Taxation] . . . to give the tax its broadest reach constitutionally permissible;" thus, Taxation does not require "a precise regulatory example" to enforce imposition of the CBT); Cosmair, Inc. v. Dir., N.J. Div. of Taxation, 109 N.J. 562, 570 (1988) (a State agency "cannot extend a statute beyond its language to expand its effect.")

Here, N.J.S.A. 54:10A-6(B)(4) is worded broadly to include receipts for "services performed within the state." N.J.A.C. 18:7-8.10(a), the implementing regulation is also broadly intended by providing that an allocation methodology must "reflect the trade or business practice and economic realities underlying the generation of the compensation for services," so that receipts from services are subject to the CBT, and if not otherwise apportioned, must be allocated to New Jersey. Under this controlling principle, the court is not required to focus only on an example as the correct allocation methodology.

It is undisputed that Xpedite has in-State and out-of-State customers. Xpedite receives all of its customers' orders, i.e. the information to be mass-delivered or blasted, at its operations centers in Tinton Falls and/or Piscataway, and disseminates the same from New Jersey to recipients both within and outside the State. The hardware and/or software used to receive the customer's orders, and to determine the least cost route for transmission of the information required to be blasted or mass-delivered, are located in New Jersey. Xpedite's business model sketch endorses Taxation's conclusion that Xpedite's hub is in New Jersey, New Jersey is where the services are performed, and New Jersey is where the significant tangible and intangible property required to initiate, and perform the services is located. Consequently, Taxation's allocation methodology, i.e. using the 25-50-25 formula under N.J.A.C. 18:7-8.10(c), is not patently unreasonable or invalid.

Additionally, Taxation's regulations are not solely focused on the customer base. See, e.g., United Parcel, 25 N.J. Tax at 36 (rejecting the taxpayer's argument that its data processing receipts should be allocated based on location of its customers similar to the example of allocation to "the location of originators of long distance calls," because "the users of the service" of the taxpayer "contact and interact with the equipment [in New Jersey] remotely."). The court found that 100% of the receipts were taxable (i.e. sourced to New Jersey) because "[t]he equipment performing the data processing was located in New Jersey, and the personnel necessary to operate, maintain and repair the equipment also were located in this State." Id. at 36-37. The fact that the "users of the service having equipment necessary to access the information generated in New Jersey were located outside of this State does not alter the fact that the services producing the revenue subject to tax all were performed within New Jersey." Id. at 37. The court noted that the two examples in N.J.A.C. 18:7-8.10(c) evidenced that equipment location is of "significance," thus, supported its conclusion, since if the taxpayer had equipment outside New Jersey, then its receipts would very likely be allocated under the 25-50-25 rule. United Parcel, 25 N.J. Tax at 37. This is precisely how Taxation's auditor allocated the receipts.

The court does not consider N.J.A.C. 18:7-8.10(c) as limited to internet access providers. That is simply an example of how subsection (c) can be applied. Therefore, although Xpedite is not in the business of providing the services of internet access to the public, it does not foreclose application of that regulation to Xpedite.

It is true that the 25-50-25 rule addresses "fees" for services, such as, for example, fees for internet access, or "service income fees" for cash advances to credit card users. It does not appear that all of Xpedite's charges include flat fees. Nonetheless, this does not render the assessment invalid, nor does it require the court to fit Xpedite's revenues into Example 2, as a default

mechanism. Xpedite still charges fees for its services, plus a "minimum commitment" fee, as well as flat fees for other services. Those receipts would still be taxable under N.J.S.A. 54:10A-6(B)(6) as "all other business receipts." See, e.g., Bank of Am. Consumer Card Holdings v. Dir., Div. of Taxation, 29 N.J. Tax 427, 460 (Tax 2016) (rejecting an argument that when services are not performed in New Jersey, then credit card fees are not allocable under N.J.S.A. 54:10A-6(B)(4), and when so excluded cannot be included under N.J.S.A. 54:10A-6(B)(6), thus, "should be excluded from the numerator of the allocation fraction in toto." Such an argument, the court held, would "ignore[] subsection 6," which is a catch-all provision). Based on factual representations that some POPs and/or switching devices are located out-of-State, it was not unreasonable nor arbitrary for Taxation to use 25-50-25 as an allocation method for sourcing Xpedite's receipts.

Does Xpedite fit within Example 2 so that its receipts allocable to New Jersey are limited to the "billings for calls originating in New Jersey"? As noted above, Example 2 addresses the allocation of LD "toll revenues," from the sales of "long distance telephone communications service." Xpedite claims it sells LD telephone services. Taxation argues Xpedite is not a LD telephone company, i.e. one which is regulated and licensed by the FCC, or the traditional ILEC such as AT&T. Therefore, per Taxation, Xpedite cannot provide, thus, sell LD telephone services.

Example 2 does not define what comprises "[LD] telephone communication services." It does not require the seller to be a telecommunications provider or carrier, or a LD telephone company such as AT&T. It does not define "originators" or "toll revenues." However, when considered in the time and context in which Example 2 was promulgated, Taxation's argument limiting the illustration to an FCC licensed LD telephone carrier is not unreasonable.

As explained above, Example 2 was promulgated in 1984, and in reaction to Metromedia. See 16 N.J.R. 3420(b). It was re-structured in 1997, however, until then (or at least until 1996)

19

"local telephone markets were monopolies of each" ILEC, such as AT&T.  Sw. Bell Tel. Co., 207

F. Supp. 3d at 692.  Even after the monopolies were broken up by an amendment to the federal

telecommunications law in 1996, telecommunications providers were still subject to several fees

and "tariffs," see id. at 693-94, as well as being regulated by the FCC.  See also N.J.S.A. 54:4-1

(defining a "local exchange telephone company" as a "telecommunications carrier providing dial

tone and access to 51% of a local telephone exchange"); Verizon N.J. Inc. v. Borough of Hopewell,

26 N.J. Tax 400, 407-10 (Tax 2012) (after the breakup of AT&T in 1984 "[c]ompetitive [LD]

telephone service . . . was offered by carriers such as the post-divestiture AT&T, MCI and Sprint,"

and after the 1996 federal telecommunications statute was passed, the LECs increased and the

ILECs provided the majority of "end-user connections for land line . . . local telephone services in

New Jersey . . . .").

Thus, it is not unreasonable to construe Example 2 as applying to a carrier, which is

regulated and licensed by the FCC, such AT&T, MCI, or Verizon or other licensed LECs or

CLECs, which originate the carrier signals.  Based on the facts above, Xpedite is not a carrier; is

not licensed by the FCC (even if its sister company, PCI is licensed); is not paying common carrier

tariffs required by the FCC; is not licensed or authorized by New Jersey agencies regulating

utilities as a LD telephone provider or carrier; and is fully dependent on third-party LD telephone

companies and local telephone companies in the performance of, and for the success/longevity of

its business; in transmitting its customers' LD calls, and for call origination and termination.  Cf.

RCN Telecom Serv., Inc. v. Dir., Div. of Taxation, 25 N.J. Tax 409, 421 (Tax 2010) (rejecting

Taxation's argument that the taxpayer, who had for purposes of the SUT exemption, provided "as

proof that it was a service provider subject to the jurisdiction of the FCC . . . a list of licenses granted by the FCC," should still show that it was "licensed in New Jersey" to be exempt).[11]

Does the fact that Xpedite leases LD telephone services from third party LD carriers such as AT&T, and uses those carriers' telephone lines, network, and communications facilities to make telephone calls to perform its fax blast services render it as a provider selling LD telephone services, and deriving income from LD "toll revenues"? The court thinks not. Xpedite uses LD carriers and their telephone network, telephone lines, POPs and the like, depending on which is the cheapest (i.e. least cost routing), and enhances the same by offering its "fax broadcast" and "gateway services." It is still AT&T or a similar carrier that is providing LD telephone communication services. Verily, Example 2 addresses an entity which earns income from "sale" of LD telephone services, not an entity which "provides" such services. However, as noted above, when considered in the time and context of the example's promulgation, there was no distinction between the two, since only a provider, i.e., an FCC licensed carrier, could sell such services, not entities such as Xpedite which used those carrier signals, and are not licensed by the FCC as a long distance telephone communications provider. See, e.g., In re Fed.-State Jt. Bd. on Univ. Srvc., 13 F.C.C. Rec. 11501, 11520-21, n.78 (Apr. 10, 1998) ("[W]here users rely on the public switched network to reach the information service provider, it is the telephone company, not the information service provider, that is offering to the public transmission over the public switched network. The information service provider, therefore, is not providing telecommunications service," and

---

[11] Xpedite's claim that it need not be licensed but is still "subject to" FCC's jurisdiction, does not change this conclusion since any entity can be liable for using faxes for sending unsolicited advertisements. See 47 U.S.C. § 227 (b)(1)(C), making it unlawful to "use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement."

"[w]hen an entity offers subscribers the capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information via telecommunications, it does not provide telecommunications; it is using telecommunications.") (internal quotation marks omitted); Vonage Holdings Corp. v. Minn. Pub. Util. Comm'n, 290 F. Supp. 2d 993, 1003 (D. Minn. 2003) (provision of voice over internet protocol services was "the enhanced functionality on top of the underlying network," thus, was not an FCC regulated telecommunications service) (relying upon the FCC's report to Congress, 13 F.C.C. Rec. 11501)), aff'd, 394 F.3d 568 (8th Cir. 2004). Xpedite, which claims to be providing "enhanced" telecommunication services, can similarly be said to be providing an enhancement "on top" of the third party's LD telephone network, thus, is not providing or selling LD telephone services as contemplated by the illustration at issue here (Example 2).

The court makes one final observation. Even if it were to be argued that the type of entity intended to be addressed by, the scope of, and the terms/phrases used in Example 2 are vague, and the regulatory history provides no insight or assistance in this regard, it does not require a conclusion that the allocation of Xpedite's receipts of "toll revenues" is limited to "billings for calls originating in New Jersey," (the latter phrase itself indicating that the limited allocation would not apply since Example 2 would not apply to Xpedite since 100% of its calls originate in New Jersey). As explained above, an example or illustration cannot limit or expand the statute or the regulation. It is the statutory intent which controls. Moreover, the issue in this case is the reasonableness of Taxation's allocation methodology as to which it has "broad authority" to make adjustments which would "accurately and fairly" represent a taxpayer's "activity, business, receipts." Metromedia, Inc., 97 N.J. at 323. Here, the intent of N.J.S.A. 54:10A-6 is inclusive, not exclusive. The same inclusive intent underlies N.J.A.C. 18:7-5.10(a). Under both the statute

22

and the regulation then, Xpedite's receipts would be 100% allocable to New Jersey. As such, any ambiguity in Example 2 need not be resolved in favor of Xpedite such that it can allocate 5% -7% as reported on its CBT returns. See, e.g., Fedders Fin. Corp. v. Dir., Div. of Taxation, 96 N.J. 376, 384-386 (1984) (in interpreting statutes, courts must "follow the clear import of statutory language," and "when interpretation of a taxing provision is in doubt, and there is no legislative history that dispels that doubt, the court should construe the statute in favor of the taxpayer," so that a taxpayer cannot be taxed beyond what the statute provides, however, where the taxpayer seeks an exemption from tax, then "the probable legislative intent is one of inclusion."); Adamar of N.J. v. Dir., Div. of Taxation, 17 N.J. Tax 80, 86 (Tax 1997) ("Regardless of which principle applies, and which party has the burden of persuasion, the court's duty in construing a statute is to determine" legislative intent, and if the court finds the intent is "inclusive," such as the SUT Act, then taxpayers "have the burden of demonstrating that their" transactions are not taxable, "and any doubt as [sic] taxability should be resolved in favor of" Taxation) (citation and internal quotation marks omitted), aff'd, 18 N.J. Tax 70 (App. Div. 1999).

The remaining issue is possible inconsistent treatment of Xpedite under the SUT Act. Taxation does not dispute that Xpedite collects sales tax from its customers under N.J.S.A. 54:32B-3.[12] The auditor accepted Xpedite's reporting based on the "two out of three" factors. See supra

---

[12] In 2002, Xpedite's protested Taxation's denial of its claim for refunds of SUT for 1997-2001, claiming its computers (including the hardware and software) and "related communications equipment," such as servers and routers, were exempt under N.J.S.A. 54:32B-8.13(c). It contended that "all telecommunications services performed at Xpedite's New Jersey facility originate in the State," it resold the third party phone services as part of its fax services, and was "subject to" FCC's jurisdiction generally having submitted comments to a proposed FCC regulation on unsolicited phone/fax advertisements. Taxation granted the SUT refund for Xpedite's equipment pursuant to N.J.S.A. 54:32B-8.13, but claimed it had insufficient information of the "assets used directly in the transmission of [Xpedite's] faxes."

note 2. Thus, when collecting such tax for New Jersey, Taxation has not disputed that Xpedite is selling telecommunications.

Taxation maintains that the inconsistency, if any, is not controlling not only because the SUT Act broadly defines telecommunications, but also because the issue here is the allocation of receipts to New Jersey, where consideration must be given not just to the nature of services, but also to the cost of performance and economic realities, and Example 2 is limited to an LD telephone company, of LD telephone calls, and of toll revenues from LD calls. Xpedite contends that it is the same sales which are at issue, therefore, if it is deemed to be selling telecommunications under the SUT Act, then it must be doing the same for purposes of the CBT Act.

The issue here is the quantum of receipts allocable to New Jersey for CBT. Xpedite has not challenged the validity of the controlling statute, N.J.S.A. 54:10A-6(B)(4), -6(B)(6), or the regulation, N.JA.C. 18:7-8.10(a). As noted above, the allocation methodology must ultimately be one which fairly reflects the business and the economic realities of how income is generated. The economic reality is that almost everything to do with the fax blasts (Xpedite's services), occurs in New Jersey. Xpedite receives the customers' order in New Jersey. Xpedite uses it software and hardware, located in New Jersey, to decide the least cost routes. Xpedite originates the fax blasts from New Jersey. Xpedite monitors the progress and delivery of the fax blasts from New Jersey. Xpedite generates delivery status reports to its customers from New Jersey. The fact that it uses RFDC's or POPs located outside New Jersey is only to lower costs, and does not change the fact that the transmissions begin in New Jersey (the customer is presumably using its own LEC, CLEC, or ILEC to send its order to Xpedite, thus, Xpedite cannot claim to be providing LD telephone services to its customer in this regard).

24

The SUT Act deeming Xpedite as selling telecommunications becomes relevant only if one is attempting to fit Xpedite into Example 2, and then construe Example 2 broadly to cover any type of telecommunications. The court has found to the contrary. Additionally, under such a construction, internet access providers could also fit into Example 2 since they could be using LD telephone lines (at least back in 1984 when the regulation was amended and modems were used to connect to the internet). If so, N.J.A.C. 18:7-8.10(c), and Example 2 therein addressing internet access services become redundant.[13] Of note is also the fact that the SUT Act broadly encompasses all forms of telecommunications as subject to the tax except for radio and television broadcast. Example 2 is limited to LD telephone services.

In any event, Taxation applied a similar 25-50-25 analogy to "source receipts to NJ," and determine sales tax payable (i.e. based on call origin, customer billing, and call destination). Thus, even if Xpedite is considered a retailer of telecommunications under the SUT Act, it does not require that the allocation be limited to its customers billed at a New Jersey address for purposes of determining the numerator portions of the receipts factor under the CBT Act.

## CONCLUSION

In sum, the court finds that Taxation's allocation methodology for the numerator portions of receipts from services comports with the language and intent of the controlling statute and regulations, and its adjustment to Xpedite's allocation factor was reasonable. Metromedia, Inc., 97 N.J. at 323. Xpedite has not met its burden of overcoming the presumptive correctness of Taxation's CBT assessments. TAS Lakewood v. Dir., Div. of Taxation, 19 N.J. Tax 13, 140-41

---

[13] Effective 2008, internet access service is not considered "telecommunications" under the SUT Act. See N.J.SA. 54:32B-3(cc).

25

(Tax 2000). Therefore, the court grants Taxation's cross-motion for summary judgment. The complaint is dismissed.

Very truly yours,

Mala Sundar, J.T.C.